RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LAURIE RANGE, et al.,

        *Plaintiffs-Appellees* (12-3857),

    *Plaintiffs-Appellants/Cross-Appellees*

        (12-4190 & 12-4192),

      *v.*

KENNETH DOUGLAS,

        *Defendant,*

ESTATE OF BERNARD KERSKER, Individually and in
his official capacity as an employee of Hamilton
County, Ohio; ESTATE OF DR. FRANK CLEVELAND,
on behalf of Dr. Cleveland in all his capacities;
HAMILTON COUNTY, BOARD OF COUNTY
COMMISSIONERS,

      *Defendants-Appellants* (12-3857),

    *Defendants-Appellees/Cross-Appellants*

        (12-4190 & 12-4192).

Nos. 12-3857/4190/4192

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cv-00473—Michael R. Barrett, District Judge.

Argued: October 1, 2013

Decided and Filed: August 15, 2014

Before: ROGERS, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Pamela J. Sears, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati,
Ohio, for Appellants in 12-3857 and for Appellees/Cross-Appellants in 12-4190 and 12-4192.

1

Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellees in 12-3857 and for Appellants/Cross-Appellees in 12-4190 and 12-4192. **ON BRIEF:** Pamela J. Sears, Mark C. Vollman, Jerome A. Kunkel, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellants in 12-3857 and for Appellees/Cross-Appellants in 12-4190 and 12-4192. Alphonse A. Gerhardstein, Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Arthur W. Harmon, Jr., ARTHUR W. HARMON, JR. LLC, Cincinnati, Ohio, Joseph M. Hutson, COHEN, TODD, KITE & STANFORD, LLC, Cincinnati, Ohio for Appellees in 12-3857 and for Appellants/Cross-Appellees in 12-4190 and 12-4192.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge. These cases arose when the family members of murdered young women discovered that the bodies of their loved ones had been sexually abused. Kenneth Douglas, a former morgue attendant for the Hamilton County Morgue, sexually abused an untold number of bodies while he was drunk or high and on duty at the morgue. Three of the bodies Douglas sexually abused belonged to family members of Plaintiffs. Plaintiffs sued Douglas himself, who was convicted of the crime of gross abuse of a corpse, but the civil claims against him are not part of these appeals. Plaintiffs also sued several Hamilton County Defendants alleging state law claims and a claim under 42 U.S.C. § 1983. After the district court granted partial summary judgment to the County Defendants, the parties brought these separately docketed appeals.

In Case No. 12-3857, the County Defendants bring an interlocutory challenge to the denial of Ohio immunity regarding the state claims. Because a jury could find that the County Defendants recklessly and wantonly failed to supervise Douglas despite the known risks he posed to the bodies, we **AFFIRM** the denial of Ohio statutory immunity and remand those claims for further proceedings.

In Case Nos. 12-4190 and 12-4192, Plaintiffs bring a Rule 54(b) challenge to the grant of summary judgment based on qualified immunity to the County Defendants on the § 1983 claim, and the County Defendants cross-appeal. While we have no doubt as to the special nature of the relationship between Plaintiffs and their deceased relatives, we conclude that they cannot

establish a constitutional violation as to the County Defendants.  Therefore, we must **AFFIRM** the grant of summary judgment to the County Defendants on the § 1983 claim.

## I. BACKGROUND

### A. Facts

Over a number of years, Kenneth Douglas sexually abused the dead bodies of murder victims held at the Hamilton County Morgue.  He sexually abused the body of Karen Range in 1982, an action that led to a false rape conviction of the man who was convicted of her murder.  He sexually abused the bodies of Charlene Appling and Angel Hicks in 1991.  Douglas's actions were discovered in 2007 after advances in forensic science allowed testing that matched his DNA to semen found in the bodies.

Douglas was regularly alone at the morgue, usually during the late afternoon or evening hours, and had sex with each of the bodies while on duty and alone.  Douglas said that the body of Range was the first one he abused, but admitted to abusing many other bodies as well.  Douglas was regularly under the influence of alcohol, marijuana, and cocaine while at work and was under the influence every time he abused the bodies.  An expert for Plaintiffs described Douglas as an "opportunistic necrophile" and opined that Douglas's substance abuse was a "major contributing factor to his sexual abuse of corpses."

During his time at the morgue, Douglas was directly supervised by Bernard Kersker, the morgue director, who was in turn supervised by Carol Maratea, the morgue administrator.  Maratea was supervised by Dr. Frank Cleveland, the Coroner.  Much in this case depends on what Kersker and Dr. Cleveland knew or had reason to know.  For purposes of all issues on appeal, we must view the facts in the light most favorable to Plaintiffs.

Kersker admitted having concerns about Douglas's tardiness and dependability as far back as 1980.  Douglas was often tardy and he used a significant number of sick days, especially in 1990 and 1991.  Kersker said that he disciplined Douglas by docking his pay, making him stay late, and by having him talk to Dr. Cleveland, but that "I was going to keep him because I needed him."

There is also evidence on the record suggesting that Kersker knew or should have known about Douglas's alcohol use and perhaps his drug use.  A co-worker testified that he often smelled alcohol on Douglas before, during, or after his shift; that Douglas looked like "he had been partying every night" both at the beginning and end of his shift; and that he sometimes came to work drunk.  Douglas testified that his cocaine addiction was so bad by 1992 that he could not perform his job duties because of heavy shaking.

Douglas's former wife, Patricia Chavis, testified that she called Kersker to complain that Douglas was drinking at work.  Twice around 1987, she told Kersker that Douglas was coming home intoxicated and that she knew he was drinking at work because she called Douglas at the morgue fifteen minutes before he arrived at home.  Kersker told her to stop calling the morgue and hung up on her.  Kersker denied having these conversations, but another employee testified that he heard Kersker discussing them with Douglas.

The record also suggests that Kersker may have known that Douglas was having sex with live women at the morgue, something he apparently did with some frequency.  Kersker himself took messages from the women who constantly called the morgue for Douglas, and Douglas's wife stated during one of her calls to Kersker that Douglas came home "smelling like sex." Chavis also told Maratea that she believed Douglas was having sex at the morgue, warned her about Douglas's drinking, and told her that other morgue employees were using cocaine.

Finally, Douglas himself testified that Kersker knew about his numerous run-ins with the law, including a domestic violence charge and two DUI's, because Douglas had to request vacation time for the period of incarceration.  Douglas also testified that he told Kersker about his suicide attempt via overdose and his ensuing psychiatric hospital stay as well as his alcoholism.

During all this time, Kersker's supervision of Douglas never changed.  There is testimony suggesting that the environment at the morgue was very "laid back" and that other employees were also drug users.  At least one employee made lewd comments about the bodies of women that came into the morgue.  While Kersker denied allowing such behavior, he did say in a deposition that one of the risks of morgue attendants drinking at work is that they might disrespect or harm the bodies.

**B. Procedure**

The claims in these appeals are against the "County Defendants": Hamilton County through the Hamilton County Board of Commissioners, Kersker, and Dr. Cleveland.[1]  Plaintiffs brought three claims under Ohio tort law, alleging negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent retention and supervision, and one claim under 42 U.S.C. § 1983, alleging due process violations.

After much discovery, the district court issued an order granting partial summary judgment to the County Defendants.  As to the state claims, the court denied summary judgment on the basis of Ohio statutory immunity to the County Defendants because it found that there were genuine issues as to whether they supervised Douglas in a wanton and reckless manner, but granted Ohio common law immunity to Kersker and Dr. Cleveland regarding claims brought by the family of Karen Range.  As to the § 1983 claim alleging a substantive due process violation, the district court granted summary judgment to the County Defendants.  The court granted qualified immunity to Kersker and Dr. Cleveland because nothing in the record indicates that they knew Douglas might sexually abuse the bodies, and granted summary judgment to Hamilton County because Plaintiffs could not establish deliberate indifference.

As to the state claims, the County Defendants appealed the denial of Ohio immunity and moved for certain tort-law questions to be certified to the Ohio Supreme Court.  As to the § 1983 claim, Plaintiffs received certification under Federal Rule of Civil procedure 54(b) and appealed the grant of summary judgment.  The County Defendants cross-appealed, alleging errors in the district court's reasoning.  We consolidated the cases for argument.

## II. CASE No. 12-3857, STATE CLAIMS

The County Defendants claim immunity under Ohio law from the state claims, but the basis for immunity varies depending on the Ohio immunity law in effect at the time each alleged act occurred.  *Hubbard v. Canton City Sch. Bd. of Educ.*, 780 N.E.2d 543, 454 (Ohio 2002).  For claims arising out of the 1982 abuse of Karen Range, Hamilton County relies on Ohio common

---

[1]Kersker and Dr. Cleveland both died while this suit was pending.  They have been replaced as parties by their respective estates.

law immunity.[2]  For claims arising out of the 1991 abuse of Charlene Appling and Angel Hicks, Hamilton County claims immunity under Ohio Revised Code §§ 2744.03(A)(3) and (A)(5). Also for the 1991-based claims, Kersker and Dr. Cleveland, in their individual capacities, claim immunity under Ohio Revised Code § 2744.03(A)(6)(b).

## A. Choice of Law

Generally, state substantive law and federal procedural law apply to state claims.  *E.g.*, *Tompkins v. Crown Corr., Inc.*, 726 F.3d 830, 837 n.4 (6th Cir. 2013) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).  Federal procedural law governs jurisdiction over an interlocutory appeal of denial of state immunity, *see Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007), but our jurisdiction here depends on the substance of state immunity, which is a matter of state substantive law, *see Chesher*, 477 F.3d at 793-94; *see also Town of Smyrna, Tenn. v. The Municipal Gas Authority*, 723 F.3d 640, 645-47 (6th Cir. 2013).  Thus, our analysis on certain issues involves overlapping federal and state law.

## B. Jurisdiction

This interlocutory appeal presents jurisdictional issues, though the parties do not raise them.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (holding that courts must ensure that it has jurisdiction, even if sua sponte); *Smyrna*, 723 F.3d at 644 (noting that courts must address interlocutory jurisdiction).  Our jurisdiction is normally limited under 28 U.S.C. § 1291 to review of "final decisions" of the district court, but the collateral order doctrine allows for review of a limited class of decisions that "finally determine claims of right, separable from, and collateral to, rights asserted in the action."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  The collateral order doctrine extends to appeals of a denial of state immunity only when the state immunity in question would provide complete immunity from suit; if the state immunity is merely from liability, then we have no jurisdiction to review the denial until a final judgment is rendered.  *Sabo v. City of Mentor*, 657 F.3d 332, 336 (6th Cir. 2011); *Chesher*, 477 F.3d at 793.

---

[2]The district court granted summary judgment to Kersker and Dr. Cleveland in their individual capacities for the claims arising out of the abuse of Karen Range, but that decision is not presently on appeal.

**1. Jurisdiction over Hamilton County common law municipal immunity**

For claims arising out of the abuse of the body of Karen Range, Hamilton County seeks common law immunity under *Enghauser Manufacturing Co. v. Eriksson Engineering, Ltd.*, which formerly provided municipalities certain limited immunity from liability.  451 N.E.2d 228, 232 (Ohio 1983); *see also Chesher*, 477 F.3d at 793 (noting that Ohio statutory immunity prior to 2003 provided only immunity from liability); *Greyhound Food Mgmt. Inc. v. City of Dayton*, 852 F.2d 866, 868 (6th Cir. 1988) (explaining that Ohio statutory immunity prior to 2003 was a reenactment of common law immunities).  Because *Enghauser* provided immunity from liability and not from suit, we do not have interlocutory jurisdiction over the immunity claim arising out of the abuse of Karen Range.

**2. Jurisdiction over statutory immunity of the County Defendants**

For claims arising out of the abuse of the bodies of Charlene Appling and Angel Hicks, the County Defendants all seek immunity under Ohio Revised Code § 2744.  Since 2003, Ohio statutory immunity has provided complete immunity from suit, which means there is interlocutory jurisdiction.  *Chesher*, 477 F.3d at 793-94.  Because the change in Ohio law does not apply retroactively, however, the existence of jurisdiction here depends on when the underlying claims accrued in relation to the 2003 passage of the Act.  *Id.* at 794 (citing *Jackson v. Columbus*, 804 N.E. 2d 1016, 1019-20 (Ohio Ct. App. 2004)).  If the claims accrued after 2003, we have interlocutory jurisdiction; if they accrued before, we do not.  *Id.*

Emotional distress claims "accrue not when the underlying activity occurs, but rather when the plaintiffs suffer emotionally by learning of it."  *Chesher*, 477 F.3d at 794.  According to the Complaint, between 2007 and 2009, Plaintiffs each learned that Douglas abused the bodies of their loved ones.  Jurisdiction, therefore, exists to consider questions of Ohio statutory immunity arising out of these claims.

For the negligent retention and supervision claims, however, the accrual date is not dispositive because we may exercise pendent jurisdiction "where the appealable and non-appealable issues are inextricably intertwined."  *Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir. 2004) (internal quotation marks omitted).  The analysis of Ohio statutory immunity is

identical for all three state claims.  Because they are thus "inextricably intertwined," we have interlocutory jurisdiction over the County Defendants' state immunity claims arising out of the abuse of Charlene Appling and Angel Hicks.

**3. Scope of Jurisdiction: Motion to Certify and Other Issues**

Interlocutory jurisdiction for denials of immunity is limited to the specific issue of whether immunity was properly denied.  *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 605 (6th Cir. 2005) (citing *Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir.2004)). Therefore, although the parties' arguments often stray into the underlying merits of the state tort claims—including issues of foreseeability, causation, tortious interference, evidence of harm, duty of care, and intervening causation—these questions are not properly before us.  Nor do we consider any questions of fact because our jurisdiction is limited "'to the extent that [the appeal] turns on an issue of law.'"  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  For purposes of this appeal, the County Defendants "must concede the most favorable view of the facts to the [P]laintiff[s]."  *Id*. at 309-310 (internal quotation marks omitted).

The County Defendants have also moved to certify to the Ohio Supreme Court four questions regarding duties existing under state tort law.  All of these questions are outside the scope of immunity issues on interlocutory appeal and may be raised only after final judgment. Therefore, we deny the motion.  The parties will have sufficient opportunity to raise these issues before the court below.

**C. State Immunity for Claims Relating to the Abuse of Appling and Hicks**

We review a denial of summary judgment based on state immunity de novo.  *Chesher*, 477 F.3d at 796.  Summary judgment is proper only when there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

In 1985, Ohio passed the Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744 and governing state immunity for political subdivisions and their employees.  *Lambert v. Clancy*, 927 N.E.2d 585, 588 (Ohio 2010).  For provisions that have since been amended, we use the version that was in place in 1991, at the time Douglas abused the

bodies of Appling and Hicks.  *See Hubbard v. Canton City Sch. Bd. of Educ.*, 780 N.E.2d 543, 454 (Ohio 2002) ("We are bound to apply the words [of the immunity statute] in effect at the time the alleged negligent acts occurred.").

Ohio uses a three-tier analysis to determine if a person or entity is immune.  *Lambert*, 927 N.E.2d at 588.  Under Tier 1, political subdivisions and their employees receive a general grant of immunity for acts in connection with a government function.  *Id.*; *see also* Ohio Rev. Code Ann. § 2744.02(A)(1) (2013).  Tier 2 lists five exceptions to this immunity.  *Lambert*, 927 N.E.2d at 588; *see also* Ohio Rev. Code Ann. § 2744.02(B).  If an exception applies, courts then look to Tier 3 to see if immunity is reinstated under any of the defense provisions in Ohio Revised Code § 2744.03.  *Lambert*, 927 N.E.2d at 588.  The parties agree that the County Defendants have general immunity under Tier 1 because they are a political subdivision and employees of a political subdivision, *see* Ohio Rev. Code Ann. §2744.02(A)(1) (not amended since 1991), and that the County Defendants are potentially liable under Tier 2 because the alleged acts occurred "within or on the grounds of buildings that are used in connection with the performance of a government function."  Ohio Rev. Code Ann. § 2744.02(B) (2013) (2003 amendment inapplicable); *see also Hubbard*, 780 N.E.2d at 545-46.  The parties dispute whether immunity may be reinstated for any of the County Defendants under Tier 3.

## 1. Hamilton County's Claims of Immunity Under Ohio Revised Code § 2744.03(A)(3)

Hamilton County claims that it is entitled to immunity under two separate provisions, the first of which reads:

> (3) The political subdivision is immune from liability *if the action or failure to act* by the employee involved that gave rise to the claim of liability *was within the discretion of the employee with respect to policy-making, planning, or enforcement powers* by virtue of the duties and responsibilities of the office or position of the employee.

Ohio Rev. Code Ann. § 2744.03(A)(3) (2013) (not amended since 1991) (emphasis added). Hamilton County may assert the (A)(3) defense if 1) "an employee who has the duty and responsibility for policy-making, planning, or enforcement, by virtue of office or position [2)] actually exercises discretion with respect to that power" when giving rise to the claims in

question. *Elston v. Local Sch.*, 865 N.E.2d 845, 851 (Ohio 2007).[3] But the defense covers only "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by . . . a high degree of official judgment or discretion." *Id.* (internal quotation marks omitted). "[O]nce the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Id.* (internal quotation marks omitted). In response to a city's argument that *any* act involving a judgment call qualifies as discretionary under these provisions, an Ohio court responded, "Horsefeathers. Unfortunately, too many courts have fallen victim to this specious argument." *McVey v. Cincinnati*, 671 N.E.2d 1288, 1290 (Ohio Ct. App. 1995). Instead, the court explained, "immunity attaches only to the broad type of discretion involving public policy made with the creative exercise of political judgment" and not to "the details of carrying out the activity even though there is discretion in making choices." *Id.* (internal quotation marks omitted).

For example, in a case where a school district was sued because a baseball coach failed to properly supervise practice or train the players, the Ohio Supreme Court held that the (A)(3) defense did not apply because the coach's position did not involve "the exercise of a high degree of official judgment or discretion." *Elston*, 865 N.E.2d at 847, 852 (internal quotation marks omitted). Nor did the defense apply in a case where a school system was sued because a student volunteer was injured at an unsupervised sporting event. *Spaid v. Bucyus City Sch.*, 760 N.E.2d 67, 68-69, 72 (Ohio Ct. App. 2001). Although teachers made a discretionary decision that the event would be unsupervised, it was not "the type of decision making with respect to public policy and planning that is characterized by such a high degree of discretion." *Id.* at 70, 72. Likewise, the defense did not apply to a city's decision to install escalators in a parking facility because when it made this decision, the City became like any other common carrier. *McVey*, 671 N.E.2d at 1290. The County Defendants argue that a few Ohio cases apply the (A)(3) defense more broadly. But these cases were rendered no longer applicable by *Elston*. *See, e.g., Cook v. Hubbard Exempted Vill. Bd. of Educ.*, 688 N.E.2d 1058, 1062 (Ohio Ct. App. 1996)

---

[3]Because Ohio Rev. Code Ann. §2744.03(A)(3) has not been revised since the underlying acts in 1991, Ohio court interpretations of that provision that came after 1991 apply.

(holding that the (A)(3) defense applied to the discretion used by a school principle in his daily task of clearing hallways, a holding superseded by *Elston*).

In the present case, the actions or failures to act that gave rise to the negligent supervision claim were the decisions of various morgue employees regarding supervision of Douglas. The actions or failures to act that gave rise to the emotional distress claims included those actions as well as the abuse itself. The abuse cannot qualify as a policy-making or planning decision. We turn to the other actions, viewing the facts in the light most favorable to Plaintiffs. Protection might be afforded to tasks that could arguably be considered policy-making or planning, such as hiring the morgue director, hiring staff and determining their responsibilities, designing a rotating schedule, or managing day-to-day operations. But this record contains facts from which a jury could conclude that Hamilton County employees were not engaged in policy-making or planning but were instead making factual, employee-specific decisions. Such facts include detailed decisions about: what shift to assign to Douglas; whether to administer drug tests to him; how to respond to Douglas's continuing tardiness and dependability problems; whether to make unannounced visits while Douglas was alone at the morgue; whether to confront Douglas or change the level of supervision after his wife called to complain about alcohol and sex at the morgue; whether to supervise Douglas differently after Douglas told Kersker about his DUI and suicide attempt; and whether to look into Chavis's allegations that some of the other employees were doing drugs. These specific, fact-based single employee decisions do not involve discretionary acts of an employee with respect to policy-making, planning, or the kind of "creative exercise of political judgment" required for the (A)(3) defense.

The district court did not err by denying (A)(3) immunity to Hamilton County.[4]

---

[4]We do not reach the issue of whether our reasoning here also applies to the district court's decision denying common law municipal immunity for claims arising out of the abuse of Karen Range because, as explained above, we do not have jurisdiction over that issue. *See Enghauser*, 451 N.E.2d at 232 (common law municipal immunity from liability applies only if the acts involved government planning and policy-making).

**2. Hamilton County's Claims of Immunity Under Ohio Revised Code § 2744.03(A)(5)**

Hamilton County also claims that it is entitled to immunity under the following provision:

> (5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources *unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.*

Ohio Rev. Code Ann. §2744.03(A)(5) (2013) (not amended since 1991) (emphasis added). The only dispute here is whether there exists a genuine issue of fact as to whether the failure to supervise Douglas was wanton and reckless.

In Ohio, the question of whether a government employee has acted in a reckless or wanton manner is a question of fact for a jury. *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994). "Wanton" conduct is generally "the failure to exercise any care whatsoever," characterized by perversity of being "conscious that [the] conduct will in all probability result in injury." *Id*. It implies knowledge of the probability of harm and the "reckless disregard of consequences." *Addis v. Howell*, 738 N.E.2d 37, 40 (Ohio Ct. App. 2000). "Reckless" means that the conduct was committed with knowledge or with reason to know of facts that would cause a reasonable person to realize that the conduct in question creates an unreasonable risk that is greater than mere negligence. *Rankin v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 889 N.E.2d 521, 527 (2008). Thus, the question is whether the employees consciously disregarded a serious risk of harm that they knew or should have known about. For example, it was not reckless conduct for a state agency to place a child with a father who eventually killed the child when the father was not a *known* placement risk. *Chesher*, 477 F.3d at 799 (citing *Jackson v. Butler City Bd. of Comm'rs*, 602 N.E.2d 363, 366-68 (Ohio 1991)). Conversely, it was reckless conduct where a physical education teacher assumed that a child floating face down in the water was "joking around," sent three different students to attempt to pull the child out, and only afterward attempted CPR. *Id*. at 800 (citing *Thomson v. Bagley*, 2005 WL 940872. at *1, 11 (Ohio Ct. App. 2005)).

Our previous opinion in *Chesher* is particularly relevant. Family members sued the Hamilton County Morgue and its employees for permitting an artist to photograph, disrupt, and pose their deceased relatives at the morgue. *Id*. at 787-92. After considering a similar immunity question, we held that a jury could find that: the various morgue employees were reckless because each knew or had reason to know of some risk of harm, and the risk the employees disregarded was substantially greater than the type of risk necessary to make the conduct merely negligent. *Id*. at 801-05; *see also Moss v. Lorain Cnty. Bd. of Mental Retardation*, 924 N.E.2d 401, 407 (Ohio App. Ct. 2009) (finding enough evidence of recklessness to defeat immunity where supervision of special needs child was so lax that a child was able to wander undetected to the kitchen and retrieve a pot of hot coffee).

Turning to the record here, there is significant evidence that by the time of the abuse of the two women, Kersker knew that Douglas was an alcoholic and knew that he drank and had sex while on duty at the morgue. Two witnesses—Douglas and Chavis—said they told Kersker about the drinking and sex, and this was corroborated by one of Douglas's co-workers. Others testified that Douglas came to work smelling like booze, shaking from drug-use, and disheveled-looking. This is sufficient for a jury to find that Kersker knew that Douglas was mis-using his time alone at the morgue. A jury could also find that Kersker knew Douglas presented a risk of harm to the bodies—Kersker admitted that one of the risks of a morgue attendant being drunk on the job is that he might disrespect or harm the bodies. And there is no question that Kersker failed to mitigate any risk. He kept Douglas on shifts where Douglas would be alone several days a week, he never administered drug tests or installed cameras, and there is evidence to suggest that he maintained a very lax environment in which other employees also had enough freedom to drink, do drugs, and have visitors. Kersker admitted that he was willing to put up with" some bad conduct such as tardiness and absences from work because he "needed" Douglas. A jury could conclude from this evidence that Kersker "disregard[ed] a known risk substantially greater than that necessary to make the conduct negligent." *See Chesher*, 477 F.3d at 802 (internal quotation marks omitted). It is not necessary for Kersker to have disregarded a risk of necrophilic acts, only that he disregarded a risk that Douglas would harm the bodies in some way.

The district court did not err by denying (A)(5) immunity to Hamilton County.

### 3. Kersker and Dr. Cleveland's Claim of Immunity Under Ohio Revised Code § 2744.03(A)(6)(b)

As defendants in their individual capacity, Kersker and Dr. Cleveland rely on an Ohio law that provides immunity to an employee of a political subdivision unless the acts or omissions "were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code Ann. § 2744.03(A)(6)(b).[5] As with the (A)(5) defense, the dispute here turns on whether a jury could find that Kersker and Dr. Cleveland's failures to supervise Douglas in a manner that was wanton or reckless. Having already concluded that there are genuine issues as to whether Kersker's failures were wanton and reckless, he is not entitled to (A)(6)(b) immunity.

The record as to Dr. Cleveland is slightly different. Kersker was most immediately responsible for supervising Douglas, he designed the shift rotation scheme that left Douglas alone, and the evidence suggests that it was Kersker who knew about Douglas's drinking and sex at the morgue. The clearest indication of Dr. Cleveland's knowledge is testimony from Kersker that he kept Dr. Cleveland informed and told Dr. Cleveland about Douglas's tardiness and dependability problems. But there is additional circumstantial evidence from which a jury could infer that Dr. Cleveland had knowledge of an unreasonable risk. *See, e.g., Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 151-52 (6th Cir. 1995) (reversing grant of summary judgment on immunity grounds because district court should have considered circumstantial evidence). If a jury were to conclude that Kersker knew of Douglas's actions, it could conclude that Dr. Cleveland, whom Kersker kept informed, also knew. Knowledge of the risk factors could be inferred as well because Maratea, Dr. Cleveland's direct subordinate, heard allegations from Chavis that Douglas drank alcohol and had sex at the morgue and that other employees did drugs at the morgue. Even if the jury found that Dr. Cleveland only knew about the serious dependability problems, a jury could conclude that he should have been more concerned about Douglas in general and instructed his subordinates to provide more supervision.

---

[5]While Ohio Revised Code § 2744.03(A)(6) has been modified since 1991, the relevant language is exactly the same. *See* Ohio Revised Code Ann. § 2744.03(A)(6)(b) (1990).

The district court did not err by denying (A)(6)(b) immunity to Kersker or Dr. Cleveland. Thus, we affirm the denial of Ohio immunity, and the state law claims alleging negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent retention and supervision may proceed below.

### III. CASE Nos. 12-4190/12-4192, §1983 CLAIM

We now turn to the second appeal, which involves the question of whether the district court erred in granting summary judgment to the County Defendants on the § 1983 substantive due process claim. Plaintiffs argue that the County Defendants are not entitled to qualified immunity because a jury could find that Kersker and Dr. Cleveland were deliberately indifferent to the known risk that Douglas would harm the bodies. They allege that extending unsupervised access to someone who would touch the bodies with no forensic purpose "shocks the conscience" and violates the substantive due process rights to family association and privacy. Plaintiffs argue that the rights at stake are obvious and that Hamilton County had a policy of deliberate ignorance to known risks of harm.

The County Defendants cross-appeal arguing that the district court erred by failing to use this Court's "plainly obvious" and "particular injury" test. They also argue that the Board of Commissioners of Hamilton County, as well as Kersker and Dr. Cleveland in their official capacities, should be dismissed as parties.

This appeal is before us after the district court granted the Plaintiffs' motion under Federal Rule of Civil Procedure 54(b) to certify the judgment as to the § 1983 claims—which granted rather than denied immunity—as a "final order," and after a panel of this court denied the County Defendants' motion challenging certification.

#### A. Standard of Review

We review the district court's grant of summary judgment to the County Defendants de novo. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]his court must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party," and

must determine whether a reasonable jury could return a verdict for the plaintiff.  *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

**B. Qualified Immunity for Kersker and Dr. Cleveland**

Title 42 U.S.C. §1983 creates a private right of action against anyone who, under color of law, deprives a citizen of a right secured by the Constitution, but qualified immunity shields government officials, such as Kersker and Dr. Cleveland, from civil damages for discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether qualified immunity applies, we ask whether 1) "considering the allegations in a light most favorable to the party injured, a constitutional right has been violated," and 2) "that right was clearly established."  *McKenna v. Edgell*, 617 F.3d 432, 438 (6th Cir. 2010); *see also McCullum v. Tepe*, 693 F.3d 696, 699 (6th Cir. 2012).  We have discretion to consider either of these questions first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Whether an official is entitled to qualified immunity is also a legal question that we review de novo.  *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 693 (6th Cir. 2013).

**1. Substantive Due Process**

Under the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The due process clause has both procedural and substantive components, *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012), but Plaintiffs raise only a substantive due process claim on appeal.

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks omitted).  It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that "shock the conscience."  *Bell v. Ohio State Univ.*,

351 F.3d 240, 249-50 (6th Cir. 2003).[6]  It also protects the right to be free from "arbitrary and capricious" governmental actions, which is another formulation of the right to be free from conscience-shocking actions.  *Bowers*, 325 F.3d at 763; *Pearson*, 961 F.2d at 1216-17.

Plaintiffs' argument has two parts.  They contend that Kersker and Dr. Cleveland deprived them of an unenumerated fundamental right guaranteed by due process.  They frame this right primarily as the right to the "protection of the bodies of [their] deceased family members."  But they also invoke the right to privacy of a grieving family member, the right to "the protection and dignified treatment of their loved one's bodies," the right of family members to "privately grieve" and "make decisions regarding the disposition of the body," and the right to "non-interference with a family's remembrance of a deceased loved one."  Independent of whether any identifiable unenumerated right is at issue, they also argue that the conduct of Kersker and Dr. Cleveland was undertaken with deliberate indifference to a known risk that Douglas would harm the bodies and that this "shocks the conscience."

At least one of our sister circuits has found that the "common law right to non-interference with a family's remembrance of a decedent" is so rooted in our traditions that publication of death photos is a deprivation under the Fourteenth Amendment.  *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 164-65, 168 (2004) (suggesting in a FOIA case that family members of the deceased had a right to privacy over death-scene photos and noting that a family's control over a body has been long-recognized at common law).  We have also found, in the context of procedural due process claims, that relatives have at least a property interest in the bodies of deceased relatives.  *Whaley v. Cnty. of Tuscalosa*, 58 F.3d 1111 (6th Cir. 1995) (holding that next-of-kin has a constitutionally protected property interest in the bodies of the deceased relatives); *Brotherton v. Cleveland*, 923 F.2d 477, 481-82 (6th Cir. 1991) (holding that a widow has a constitutional entitlement to her husband's body, including his corneas); *see also Newman*

---

[6]This class of interests is narrower than those protected by procedural due process.  *Bell*, 351 F.3d at 249-50.  Thus, the County Defendants' contention that we must look for the existence of a right in Ohio state law is incorrect.  Most state-created rights that qualify for procedural due process protections do not rise to the level of substantive due process protection.  *EJS Props.*, 698 F.3d at 862; see also *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003).

*v. Sathyavaglswarani*, 287 F.3d 786, 699-70 (9th Cir. 2007) (holding that parents have a procedural due process property right in the corneas of their deceased children). Whether or not the asserted rights exist, Plaintiffs understandably experienced the desire to protect their family members and to grieve for them in privacy. The most obvious violator of those rights, however, was Douglas, who committed the abuse. But the claims before us are brought against Kersker and Dr. Cleveland, not Douglas. Plaintiffs' claims, therefore, hinge on a deliberate indifference analysis and whether the conduct of Kersker or Dr. Cleveland themselves shocks the conscience.[7]

Our case law on substantive due process is somewhat conflicted as to whether an underlying constitutionally-protected right must be established in order for a government action to violate one's rights by shocking the conscience. *EJS Props.*, 698 F.3d at 861-62. In the context of zoning decisions, our cases hold that government action will not shock the conscience unless it touches on a protectable interest, but in other contexts we have held that, "government action may certainly shock the conscience or violate substantive due process without a liberty or property interest at stake." *Id.* Under either formulation, we acknowledge that "substantive due process is not a rigid conception, nor does it offer recourse for every wrongful action taken by the government" and that the "shocks the conscience" standard sets a high bar: "Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental." *EJS Props.*, 698 F.3d. at 862 (internal quotation marks omitted).

Over the years, the courts have used several tropes to explain what it means to shock the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). Conduct shocks the

---

[7]The County Defendants seem to suggest that this case falls under the *DeShaney* rule that, absent certain exceptions, a government actor's failure to protect an individual against private action does not violate substantive due process. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, the rubric in *DeShaney* does not apply to the present allegations, first, because Plaintiffs allege only harm caused by state actors and, second, because Plaintiffs allege that Kersker and Dr. Cleveland took an affirmative action—supervised Douglas—in a deliberately indifferent manner. The County Defendants also suggest that Kersker and Dr. Cleveland cannot be held liable because there is no § 1983 liability for the actions of a subordinate based on respondeat superior. *See Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995) ("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." (internal quotation marks and italics omitted)). The substance of Plaintiffs' claim, however, is that the conduct of Kersker and Dr. Cleveland themselves violated the constitution. *Taylor* and other cases based on the theory of respondeat superior do not apply.

conscience if it "violates the 'decencies of civilized conduct.'" *Id*. at 846 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)). Such conduct includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Id*. at 847 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation. *See id*. at 847-48.

Our cases recognize the difficulty of determining where conscience-shocking behavior resides on the continuum of actions. The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is "intended to injure" without any justifiable government interest, most clearly rises to the "conscience-shocking" level. *Id*. at 848-49. Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a "matter for closer calls." *Id*. at 849. These middle states of culpability "may or may not be shocking depending on the context." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

We have identified several considerations that bear on the question of whether deliberate indifference amounts to conscience-shocking behavior: 1) the voluntariness of the plaintiff's relationship with the government, 2) whether there was time for the government actor to deliberate, and 3) whether the government actor was pursuing a legitimate governmental purpose. *Hunt*, 542 F.3d at 536. A critical question in deliberate indifference cases is "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Ewolski v. City of Brunswick*, 510 (6th Cir. 2002) (internal quotation marks omitted). So a police officer who exhibits a reckless disregard for life during a high-speed chase does not shock the conscience because the circumstances require instant judgment, *Lewis*, 523 U.S. at 853-54 (discussing *Daniels v. Williams*, 474 U.S. 327, 332 (1986)), but an officer

who has five hours to decide whether to use tear gas and forced entry during a standoff might shock the conscience if the officer is deliberately indifferent to the risks posed to hostages, *Ewolski*, 287 F.3d at 511-12.

As Plaintiffs correctly point out, the time-to-deliberate consideration is especially relevant here because it appears that Kersker and Dr. Cleveland had ample time, years even, to appreciate whatever risks they could glean from the alleged knowledge that Douglas was drinking and having sex with live women at the morgue. Plaintiffs, however, misunderstand the nature of the time-to-deliberate consideration. The purpose of the time element is not to transform any reckless action from a tort to conscience-shocking behavior simply because the government actor had time to appreciate *any* risk of harm. Time is instead one element in determining whether the actor's culpability "inch[es] close enough to harmful purpose to spark the shock that implicates" substantive due process. *Lewis*, 523 U.S. at 853. For assessing whether conduct indicates harmful purpose and, thus, constitutional culpability, both the substance of the risk and the time the official had to appreciate it matter.

Deliberate indifference in the constitutional sense requires that the officials knew of facts from which they could infer a "substantial risk of serious harm," that they did infer it, and that they acted with indifference "toward the individual's rights." *Ewolski*, 287 F.3d at 513 (internal quotation marks omitted); *see also Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (A government actor who has time to deliberate shocks the conscience if the actions "were taken with deliberate indifference towards the plaintiff's federally protected rights." (emphasis added and internal quotation marks omitted)). So, it is the entirety of the situation that must be assessed, including a defendant's awareness of the kind and degree of risk, and of the right threatened. For example, a prison official who has time to appreciate a known risk to an inmate's medical needs can shock the conscience by failing to provide medical care. *Lewis*, 523 U.S. at 850-51. A police officer who has five hours to deliberate the known risks of bodily injury to hostages shocks the conscience by making a tactical decision to use tear gas and forced entry. *Ewolski*, 287 F.3d at 511-12. And an officer who has an opportunity to deliberate the risk to life shocks the conscience by placing a drunk woman in the passenger seat of a car with a drunk driver who is known to be violent. *Stemler v. City of Florence*, 126 F.3d 856, 862-63, 870

(6th Cir. 1997). In each case, the risk, i.e. the probability of harm, was substantial, the harm at issue was "serious," and there was evidence from which a jury could find that the defendants knew of the scope and substance of the risk. Thus, the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent.

We are not convinced by Plaintiffs' argument that "any touching" of the bodies without a forensic purpose amounts to a "serious harm" in the constitutional sense. If a drunk person moves a dead body's arm, it may amount to inappropriate behavior or even a tort violation. If done intentionally by a government actor, it's even arguable that it's a constitutional violation. *See generally Chesher v. Neyer*, No. 1:01-cv-0056 (S.D. Ohio July 28, 2004) (holding that certain touching done intentionally met the shocks-the-conscience standard). But we cannot say that protection against the possible *risk* of such an occurrence is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See EJS Props.*, 698 F.3d at 862. Nor can we agree that a jury could find that Kersker and Dr. Cleveland were aware of a "substantial risk" of what might be a more serious constitutional harm such as desecrating a body. While we agree that lapses in judgment by people under the influence are generally recognized, Plaintiffs have pointed to no cases, scientific or sociological knowledge, or literature suggesting that there is a substantial risk that an inebriated person will desecrate a body. Nor is there evidence that these Defendants knew of such a risk.

Viewing the facts in the light most favorable to Plaintiffs, a jury could find much to condemn in the conduct of Kersker and Dr. Cleveland, perhaps even recklessness. But a jury could not conclude that these Defendants were aware of facts from which they could infer a substantial risk of the kind of serious harm that occurred here, that they did infer it, and that they acted with indifference toward the rights of the families involved. We simply cannot say that the behavior of these Defendants could show deliberate indifference to Plaintiffs' constitutionally protected rights such that their actions "shock the conscience." The district court did not err in concluding that there was no violation of Plaintiffs' clearly established rights by Kersker or Dr. Cleveland.

**C. County Liability**

"Where, as here, [a county's] liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm." *Ewolski*, 287 F.3d at 516; *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (explaining that municipalities and other local governments are liable only if an employee takes an action pursuant to official policy that causes the injury). Having concluded that, as to County employees Kersker and Dr. Cleveland, Plaintiffs have not shown a genuine issue of material fact regarding a violation of Plaintiffs' constitutional rights, we must also conclude that the district court properly granted summary judgment to Hamilton County on this claim.

**D. Cross-Appeal**

Although the County Defendants prevailed on the § 1983 claims below, they "cross-appeal" alleging various errors in the district court's analysis. We generally have "no appellate jurisdiction when the appellant does not seek a change in the relief ordered by the judgment appealed from." *Wheeler v. City of Lansing*, 660 F.3d 931, 939-40 (6th Cir. 2011). This cross-appeal is dismissed.

## IV. CONCLUSION

Accordingly, as to Case No. 12-3857 regarding the state claims, we do not have jurisdiction to resolve the question of common law immunity as to claims arising out of the abuse of Karen Range, but we **AFFIRM** the district court's denial of Ohio statutory immunity for claims arising out of the abuse of Charlene Appling and Angel Hicks and **DENY** the motion to certify questions of Ohio tort law to the Ohio Supreme Court. The state claims are **REMANDED** to the district court for further proceedings.

As to Case Nos. 12-4190 and 12-4192 regarding the § 1983 claim alleging a substantive due process violation, we **AFFIRM** the district court's grant of summary judgment for the County Defendants. The cross-appeal is **DISMISSED**.