[Cite as *Granato v. Davis*, 2014-Ohio-5572.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

MARY K. GRANATO

     Plaintiff-Appellee

v.

JAMES H. DAVIS, M.D., et al.

     Defendant-Appellant


Appellate Case No.    26171

Trial Court Case No.   2013-CV-4189


(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 19th day of December, 2014.

. . . . . . . . . . .

RICHARD W. SCHULTE, Atty. Reg. No. 0066031, STEPHEN D. BEHNKE, Atty. Reg. No. 0072805, 812 East National Road, Suite A, Vandalia, Ohio 45377
     Attorneys for Plaintiff-Appellee

LAURA G. MARIANI, Atty. Reg. No. 0063284, 301 West Third Street, P.O. Box 972, Dayton, Ohio 45422
     Attorney for Defendant-Appellee
     Attorney for Defendant-Appellant-Robert Shott, M.D.

JOHN CUMMING, Atty. Reg. No. 0018710, 301 West Third Street, Fifth Floor, Dayton, Ohio 45422
     Attorney for Defendant-Montgomery County Commissioners

WELBAUM, J.

{¶ 1}    In this case, Defendant-Appellant, Robert Shott, M.D., appeals from a trial court decision denying his motion for summary judgment on grounds of immunity.  Shott contends that the trial court erred in finding that there is an issue of fact regarding whether his recklessness removed the presumption of immunity under R.C. Chap. 2744 and 42 U.S.C. 1983.

{¶ 2}    We conclude that the trial court properly denied statutory immunity to Shott under the immunity exception in R.C. 2744.03(A)(6)(b), based on genuine issues of material fact regarding Shott's recklessness in identifying and releasing a dead body from the morgue. However, the trial court did err in denying Shott qualified immunity under 42 U.S.C. 1983.  The asserted property right of Plaintiff-Appellee, Mary Granato, in her husband's body was not so clearly established that a reasonable official such as Shott would have believed that Granato was entitled to constitutional due process.

{¶ 3}    Furthermore, even if Granato had a sufficient property right, random and unauthorized deprivations of property by state actors are not violations of the procedural requirements of due process, if meaningful post-deprivation remedies are available, as they were here.  Substantive due process claims were not made at the trial level or on appeal, but even though there are genuine issues of fact regarding Shott's recklessness that preclude summary judgment in his favor for purposes of Ohio's statutory immunity, a jury could not conclude that Shott acted with deliberate indifference such that his actions would shock the conscience for purposes of a substantive due process violation.  Accordingly, the judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings.

I. Facts and Course of Proceedings

**{¶ 4}** This action arises from events that occurred following a plane crash in Union County, Ohio, on March 5, 2010. The pilot, Arthur Potter, and a passenger, Frank Granato were killed in the crash, and the Union County Coroner (UCC), Dr. Applegate, was called to the scene to recover the bodies. Because Union County contracted with the Montgomery County Coroner (MCC) for forensic services, the bodies were then transported to MCC's offices in Dayton, Ohio. MCC is one of several forensic centers in Ohio that perform 95% of the forensic autopsies in the state.

**{¶ 5}** The bodies arrived at MCC early in the morning on March 6, 2010, which was a Saturday. If possible, bodies coming into the morgue will be identified by an arm or leg band, but these particular bodies arrived in body bags, with the names written on the outside of the bag. Due to the severity of the crash, other body parts found at the scene were included in separate bags. Before the bodies arrived at MCC, Applegate had identified one body as Granato, and the other as Potter.

**{¶ 6}** Typically, an investigator is notified of a dead body through a hospital or police agency. The investigator will investigate the death and assign a number. In this case, Potter was given Case No. CC-10-0827 and Granato was given Case No. CC-10-0828 (hereafter, "827" and "828"). The same number is used both for a body and any personal effects accompanying the body.

**{¶ 7}** When bodies come into the morgue, the morgue attendant assigns a tray number (which is different from the body number) and enters that number into the computer. The bodies are then kept in a cooler until the autopsy. Only one body is autopsied at a time, and the

autopsy is completed before another body is brought into the autopsy room.

{¶ 8} Shott was the pathologist on duty on Saturday, March 6, 2010, and was assigned to the cases. The bodies were very disfigured and were not visually identifiable, due to high-speed impact from the plane crash. According to James Davis, who was the Montgomery County Coroner at the time, when this type of impact happens, there are identity problems, and the remains would be governed by the MCC policy on "unidentified bodies."[1] This policy provided as follows:

It shall be the policy of this office to use all available resources to aid in the identification of unidentified bodies brought to this office for examination. Such resources shall include but not be limited to fingerprints, dental x-rays, jewelry, identifying marks, tattoos, and the Nation Crime Information Center missing persons files.

Autopsy Technician will obtain a complete set of fingerprints on unidentified bodies that are not decomposed or burned to a point where obtaining fingerprints is not possible. After the fingerprints have been obtained they will be turned over to the Investigations Supervisor. The Investigations Supervisor will be responsible for having the fingerprints checked against the files maintained at the Dayton Police Department and the Miami Valley Regional Crime Lab.

A Forensic Odontologist whose services are available to this office will also take dental x-rays. The Investigations Supervisor is responsible for

---

[1] Shott indicated that the bodies were not "unidentified" because they had been previously identified by the UCC. However, this is contrary to Davis's testimony.

contacting the Forensic Odontologist and informing him that an unidentified body has been brought in for examination. If the Forensic Odontologist requests and the Pathologist concurs, the Autopsy Technician will remove the jaw for examination.

The Autopsy Technician Supervisor will provide the Investigation Supervisor with a detailed description of the decedent that includes a complete and accurate description of the clothing including sizes and colors; a complete and accurate description of jewelry including distinguishing marks; height and weight; color, length and style of hair; color of eyes, scars, marks and tattoos. The Investigations Supervisor will take this information along with the dental chart prepared by the Forensic Odontologist, to the Ohio Bureau of Criminal Identification & Investigation.

The process for identifying an unidentified body may be limited in scope as necessary once positive identification has been established. The Investigations Supervisor is responsible for notifying the Morgue Office once identification has been made.

Exhibit 1 attached to the Davis Deposition, pp. 1-2.

{¶ 9} At the time of the autopsy, Shott had been employed by MCC for approximately eight or nine months, after completing a one-year fellowship at MCC. Also present at the autopsy were autopsy technicians, Brandy Burchett and Danny Blevins, and photographer, Kary Riley. Although the bodies had been identified by UCC, questions arose during the autopsy regarding whether the bodies had been properly identified.

{¶ 10} The first case autopsied was the body that had been identified as Granato (828). The autopsy staff knew that two men, Granato and Potter, had died in the crash. The body labeled 828 was in two separate bags, and was accompanied by a flight jacket with the name "Potter." In addition, the personal effects with this body included a broken set of eyeglasses and a loaded Kel-Tec semi-automatic handgun. According to Shott, someone asked why Potter's jacket would be in Granato's bag. This body was clad in pants, a belt, briefs, a tee-shirt, another shirt, and suspenders, but no jacket. In addition, the autopsy indicated that the body had a yellow encased tooth; the other body had no gold or other similar teeth.

{¶ 11} The second body autopsied was identified as Potter (827), and was clad in pants with belt and briefs, a shirt, and a jacket. Throughout the autopsy procedures, the pathologist and other employees debated the possibility of the body to whom the flight jacket belonged. During the course of the case, the morgue employees, including Shott, had concerns about the identification that Applegate had provided.

{¶ 12} Although the coroner's staff could have contacted the Granato and Potter families to inquire about personal effects, they did not do that. The autopsy of body 827 (the body labeled as "Potter") also revealed abrasions with an apparent thermal injury on the right upper back. According to Mrs. Granato, her husband had injured his back a few days before the crash, and had a wound two inches long and 1/8 to 1/4" wide on his shoulder. Again, MCC did not contact the families to inquire about scars.

{¶ 13} After the autopsy, Applegate was contacted, and indicated that the "Potter" jacket had come from the body that he labeled Granato. After the autopsies had been performed, Applegate began to question his own identification of the bodies. The MCC staff also had

concerns about identity.   As a result, Shott decided to consult an odontologist.

{¶ 14}   The jaws of both bodies were removed, and the dental records for both Potter and Granato were obtained.  The procedure in this situation is to identify the jaws by number only, and to have the prior dental records available by name.   The odontologist will then attempt to match the known records to x-rays taken of the jaw, without knowing the identity of the body from whom the physical evidence has been taken.   This was the first time that Shott had used an odontologist.

{¶ 15}   The odontologist, Dr. Armstrong, conducted his review on the evening of March 9, 2010, and issued a report positively identifying Granato as body No. 827 (the body that had been previously identified as Potter).   Armstrong also indicated that the dental records of Potter were consistent with body No. 828 (the body that had been previously identified as Granato). Armstrong placed his report in the mailbox of the morgue supervisor, Jeff Delorme.   This process was used because the dentists come in during the evening and cannot access the pathologist's office.   For this reason, reports are placed in the mailbox of the morgue supervisor.

{¶ 16}   The following morning, on March 10, 2010, Shott asked Delorme about the dental reports.   Shott was sitting at his desk at the end of the hallway, and Delorme was at the other end of the hallway.   Shott asked if there was a positive identification.   Delorme looked at the report and said, "Yes, it's them."   Shott Deposition, p. 74.   Delorme testified that he offered the report to Shott, but Shott told him to "go ahead and file it and just release the bodies." Delorme Deposition, pp. 68-69.   According to Dr. Davis, a pathologist's failure to look at the odontologist's report would violate MCC's policies and procedures.   Davis Deposition, p. 101.

{¶ 17}   Later in the day on March 10, 2010, the bodies were released to funeral homes

without submission of the fingerprint evidence to any agency, and without any further attempts to verify the identities, including checking the numbers on the dental reports against the numbers that had been assigned to the bodies. Potter's family cremated the body believed to be Potter, and Granato's family held a Catholic service for the body believed to be Granato. At some point after the funerals had occurred, MCC was contacted about the fact that the wrong personal effects had been delivered to the families of the decedents. After conducting an investigation, including reconfirmation by Armstrong of his results, MCC realized that Granato was actually body No. 827, and Potter was actually body No. 828. Consequently, the wrong body had been delivered to each family.

{¶ 18} Subsequently, Mary Granato filed suit in 2011, dismissed that action, and then refiled a complaint in 2013 against Dr. Davis, Dr. Shott, and the Montgomery County Commissioners. Davis and Shott were sued individually and in their capacity as county coroners. The commissioners were dismissed in October 2013, and in March 2014, the trial court granted a motion for judgment on the pleadings in part. The only claims left remaining in the case were Counts Two and Three against Shott in his individual capacity, and Count Four, against both Shott and Davis in their individual and official capacities. The trial court then partially granted a summary judgment motion. The court concluded that summary judgment should be granted in favor of Davis on the remaining claim against him. However, the court also concluded that summary judgment should be denied in all other respects, due to the existence of genuine issues of material fact regarding whether Shott had acted recklessly by failing to undertake more stringent measures to assure the identity of the bodies. Shott appeals from the judgment of the trial court.

II.   Did the Trial Court Err in Denying Summary Judgment?

**{¶ 19}**   Shott's sole assignment of error states that:

The Court Erred in Denying Summary Judgment to Defendant Shott Because There Was No Genuine Issue of Material Fact That Removes the Presumption of Immunity.

**{¶ 20}**   Under this assignment of error, Shott contends that the trial court erred in denying his motion for summary judgment on claims brought under R.C. Chap. 2744 and 42 U.S.C. 1983, because his actions, at worst, were merely negligent, rather than reckless.  It is well-established that "[a] trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor."  (Citation omitted.)  *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999).  "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court."  (Citations omitted.)  *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).  With these standards in mind, we will consider Shott's claims, beginning with claims based on statutory immunity under Ohio law.

A.   Statutory Immunity Under Ohio Law

**{¶ 21}**   As was noted, the trial court concluded that Mrs. Granato had presented

sufficient evidence of Shott's recklessness to preclude summary judgment in favor of Shott on grounds of statutory immunity. In the remaining parts of the complaint that survived the motion for judgment on the pleadings, Mrs. Granato alleged that Shott had committed intentional infliction of emotional distress (Count Two); that Shott had breached a duty of care to Mrs. Granato and to the general public by engaging in gross negligence, wanton behavior, and recklessness (Count Three); and that Shott had violated 42 U.S.C. 1983 by interfering with Mrs. Granato's right of sepulcher (Count Four).

{¶ 22}  With respect to immunity under Ohio law, R.C. 2744.03(A)(6) provides that employees of a political subdivision are immune from liability unless one of three exceptions applies. The exception involved in this case applies when "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner * * *." R.C. 2744.03(A)(6)(b). "Recklessness is a perverse disregard of a known risk. Recklessness, therefore, necessarily requires something more than mere negligence. The actor must be conscious that his conduct will in all probability result in injury." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus.

{¶ 23}  The trial court concluded that Shott had a duty to correctly identify the remains from the crash; that Shott knew of a heightened risk via misidentification; and that Shott's failure to undertake appropriate steps to assure that the bodies were correctly identified amounted to "significantly more than negligence, making the known risk of harm  'unreasonable' " * * *. Trial Court Decision, Doc. #49, p. 17, citing *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 34.  (Other citation omitted.)

{¶ 24}  In arguing that the trial court erred, Shott first distinguishes between bodies that

the morgue receives as "unidentified John Does" and those, like Frank Granato, who arrive as identified persons. Shott thus contends that his only duty was to determine the cause of death and verify the preliminary identifications that Applegate made. Accordingly, Shott maintains that he did not violate MCC's policy on "unidentified bodies."

{¶ 25} We consider this the proverbial "distinction without a difference." Contrary to Shott's claim, the chief coroner, Davis, testified that the remains of Potter and Granato were governed by the policy on unidentified bodies, and that the pathologist is responsible for ensuring that the correct body is released. Dr. Davis further stated that it would be a violation of policies and procedures for a pathologist not to even look at the dental report.

{¶ 26} With respect to the heightened risk via misidentification, Shott argues that he could not have known that the bodies were mislabeled when they arrived; that there was no reason to know that following standard protocol would result in a significant risk of switched bodies; that Applegate assured him that the prior identifications were correct; and that the dental exam was a reasonable measure under the circumstances.

{¶ 27} Although Shott would not have known that the bodies were mislabeled when they arrived, Shott's own testimony indicates that the bodies were significantly damaged, and doubt as to proper labeling arose repeatedly during the autopsies, due to the fact that Potter's coat was found with Granato's body (which had no jacket), while the body identified as Potter was wearing a jacket. Furthermore, the following exchange occurred during Shott's deposition:

Q. Okay. Back to your conversation with Mr. Applegate. Do you recall him telling you that he was concerned about properly identifying the decedents in this crash?

A. Not initially, no.

Q. You don't recall having that conversion prior to March 10th of 2010?

A. Prior to March 10th, yes, but at the time and day of the autopsy, it wasn't until after the autopsies had been performed that he [Applegate] began to question his own identification of the bodies.

* * *

Q. And Applegate was concerned, based on your interpretation, whether the bodies were properly identified, is that what you're suggesting?

A. Yes.

Q. Okay. And you took his concern seriously as a pathologist, right?

A. Well, yes.   They were my concerns initially.

Shott Deposition, pp. 42-44.

{¶ 28}   Accordingly, we disagree with the contention that Shott lacked knowledge of a significant risk of misidentification.

{¶ 29}   Shott's final argument in this regard is that the trial court failed to point out which policies he had violated; that he did take measures to identify the bodies; that other methods of identification were of limited value; that he had no duty to match the case number on the dentist's report to the remains; and that it is speculative to conclude that he would have noticed the discrepancy even if he had reviewed the report.

{¶ 30}   We have already discussed the policies that Shott violated, which include the duty to *read* the dental report and the need to submit fingerprints to other agencies.   Since Shott chose not to even look at the report, he precluded himself from even having the ability to

discover the mistake. The same is true of his failure to submit fingerprint evidence. Furthermore, Shott knew that the employee he asked for information about the dental report had not participated in the autopsy.

{¶ 31} There were also alternative – and very simple – methods of identifying the body that could have been employed. For example, a phone call to the families would have revealed which individual (Potter) wore glasses, carried a gun, and had a gold tooth. These facts would have matched the body that had been identified as Granato, and would have indicated that a mistake had been made. Given the high risk of misidentification, as demonstrated by the significant damage to the bodies and the presence of Potter's coat on one of the bodies there were genuine issues of material fact regarding whether Shott's failure to undertake appropriate steps to ascertain the correct identity amounted to more than negligence.

{¶ 32} Shott also argues that the trial court erred in distinguishing *Winkle v. Zettler Funeral Homes, Inc.*, 182 Ohio App.3d 195, 2009-Ohio-1724, 912 N.E.2d 151(12th Dist.), which involved claims based on the erroneous release of a body from a morgue. The trial court distinguished *Winkle* because Shott's "numerous alleged omissions as the pathologist primarily responsible for the Granato and Potter cases carried greater implications and thus may be viewed as more egregious than the mistake of the lower-level morgue attendant in *Winkle*." Trial Court Decision, Doc. #49, p. 15. In this regard, the trial court stressed that identification is one of a pathologist's most important duties, and that Shott chose not to take steps to property identify Granato's remains. *Id.*

{¶ 33} We agree with the trial court. In *Winkle*, a morgue attendant who placed two bodies in the morgue checked out the wrong body a few days later to a funeral home. *Id.* at ¶ 2

and 4. Because he was the individual who had placed the bodies in the cooler, he trusted his memory and did not realize that the bodies might have been shifted. *Id.* at ¶ 4, fn.2. Although the attendant's actions were negligent, neither the attendant's consciousness of the risk, nor his duties approach Shott's awareness of the risk of misidentification and level of responsibility for properly identifying bodies.

**{¶ 34}** Accordingly, the trial court did not err in concluding that genuine issues of material fact preclude summary judgment in favor of Shott on the basis of immunity.

### B. Section 1983

**{¶ 35}** In his second argument, Shott contends that the trial court erred in finding that issues of fact exist regarding his claim of qualified immunity under 42 U.S.C. 1983. Again, Shott argues that his actions were only negligent, not wanton or reckless.

**{¶ 36}** "To establish a 1983 claim against an individual public official, two elements are required: (1) the conduct complained of must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of a federally protected right, either constitutional or statutory." *Cook v. Cincinnati*, 103 Ohio App.3d 80, 85, 658 N.E.2d 814 (1st Dist.1995), citing *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). (Other citations omitted).

**{¶ 37}** "Public officials, including police officers, who perform discretionary functions are entitled to be shielded from liability for civil damages in a 1983 claim as long as their conduct does not violate clearly established federal rights of which a reasonable person would have known." *Id.*, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982). "The test is an objective one. *Id.* This right is known in law as qualified immunity." *Cook* at 85. Because the standard is objective:

> "[C]laims of qualified immunity are to be analyzed on a fact specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, in light of clearly established law and the information that he possessed. *Pray v. Sandusky* (C.A.6, 1995), 49 F.3d 1154, 1158; see, generally, *Hicks v. Leffler* (1997), 119 Ohio App.3d 424, 427-428. The contours of the right alleged to have been violated must be sufficiently clear such that a reasonable official would understand that, what he is doing, violates that right. *Anderson v. Creighton* (1987), 483 U.S. 635, 640. 'If] officers of reasonable competence could disagree on this issue, immunity should be recognized.' *Malley v. Briggs* (1986), 475 U.S. 335, 341; see, also, *Bruce v. Village of Ontario* (Nov. 24, 1998), Richland App. No. 98-CA-9-2, unreported ('[a] violation of clearly established law must be so clear as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional').

Thus, even if the official's conduct is ultimately proved legally wrong, he still will be entitled to immunity as long as his decision was objectively reasonable. *Pray, supra,* at 1158; *see, e.g., O'Brien v. City of Grand Rapids* (C.A.6, 1994), 23 F.3d 990, 1000 (though legally mistaken as to the existence of exigent circumstances to enter house without warrant, police officers were entitled to qualified immunity because it could not be said that 'no reasonable officer, objectively assessing the situation, could conclude that there were exigent

circumstances excusing the requirement that a warrant be obtained')."

*Bordelon v. Franklin Tp.*, 10th Dist. Franklin No. 01AP-256, 2001 WL 1586540, *7 (Dec. 13, 2001), quoting *Scott v. City of Columbus*, 10th Dist. Franklin No. 00AP-689, 2001 WL 309417 (Mar. 30, 2001), *2-3.

{¶ 38} Relying on various federal decisions from the Sixth Circuit, as well as Ohio law, the trial court held that a federal due process right had been clearly established, and entitled the next of kin to dispose of a body, excluding parts retained for forensic testing, after a coroner performs its duties. Trial Court Decision, Doc. #49, p. 22. The trial court thus concluded that a decedent's next of kin has a constitutionally protected property right to have the decedent's remains returned following autopsy. The court further stated that it could "not conclude that a reasonable coroner's office employee would not have known" of this constitutional right. *Id.* In view of its prior finding that issues existed regarding whether Shott's conduct amounted to recklessness, the court denied summary judgment on Shott's federal qualified immunity claim.

{¶ 39} On appeal, Shott has not challenged the court's conclusions about the existence of this constitutional right; instead, he contends that his actions were at most negligent, rather than reckless. The fact that Shott has not challenged the trial court's conclusions does not mean that we are relieved from considering whether the court was correct.

{¶ 40} The applicable constitutional provision in the case before us is the Due Process Clause of the Fourteenth Amendment to the United States Constitution. "The due process clause has both procedural and substantive components." (Citation omitted.) *Range v. Douglas,* 763 F.3d 573, 588 (6th Cir. 2014).

{¶ 41} In *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir.2010) (*Albrecht III*), the Sixth

Circuit Court of Appeals noted that:

> The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir.2006) (citation omitted). Property interests "are defined by existing rules or understandings that stem from an independent source such as state law-rules...." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Although property rights are principally created by state law, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law.... The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Waeschle v. Dragovic*, 576 F.3d 539, 544-45 (6th Cir.2009).

*Albrecht III* at 894.

**{¶ 42}** In concluding that a property right existed, the trial court relied on the prior decision of the Sixth Circuit Court of Appeals in *Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir.1991), and R.C. 313.14, which gives certain rights to relatives of a decedent. R.C. 313.14 has been essentially unchanged in pertinent part since its enactment in 1945, and provides that:

The coroner shall notify any known relatives of a deceased person who meets death in the manner described by section 313.12 of the Revised Code by letter or otherwise. The next of kin, other relatives, or friends of the deceased person, in the order named, shall have prior right as to disposition of the body of such deceased person. If relatives of the deceased are unknown, the coroner shall make a diligent effort to ascertain the next of kin, other relatives, or friends of the deceased person.[2]

**{¶ 43}** In *Carney v. Knollwood Cemetery Assn.*, 33 Ohio App.3d 31, 514 N.E.2d 430 (8th Dist.1986), the plaintiffs brought claims against a cemetery and its superintendent for infliction of emotional distress and the mishandling of a dead body. R.C. 313.14 was not at issue, because the case did not involve an autopsy; instead, the claims arose when the cemetery unearthed the plaintiffs' relative while burying another relative. The first relative's remains were dumped behind the cemetery, and when the plaintiffs discovered this, they filed suit. *Id.* at 31-32. After a verdict in favor of the plaintiffs, the defendants appealed. *Id.* at 32.

**{¶ 44}** The court of appeals concluded that the plaintiffs had established sufficient evidence of negligent infliction of emotional distress, which had been recognized fairly recently by the Supreme Court of Ohio. *Id.* at 32-34, discussing *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131, 447 N.E.2d 109 (1983). In addition, the court rejected the contention that only the mother of the decedent had standing to pursue a claim for the mishandling of a dead body. In this regard, the court of appeals noted that, in the past, courts had resorted to the fiction of a

---

[2] *Compare* G.C. Section 2855-13, 121 Ohio Laws 591, 594, approved on July 12, 1945, which was the first enactment of this statute.

"quasi-property" interest in order to facilitate recovery for mishandling of a dead body, "without conceding the existence of a cause of action for emotional distress." *Id.* at 35. Under this fiction, recovery was limited generally to the person with legal right to dispose of the body. *Id.* The court noted, however, that this approach and the limitation on recovery had long been discredited. *Id.* Thus, the court stated that:

> Appellants' standing theory in the case at bar is premised on the ancient and discredited quasi-property fiction. Appellants argue that the cause of action lies only in the person who is entitled to the disposition of the body. Appellants further argue that the person is identified by R.C. 517.23 ("Disinterment of body buried in cemetery") as the closest next of kin who may make application for disinterment. In the case at bar, appellants contend, only Mary Klein qualified as the closest next of kin under that description.
>
> Even were this court to accept appellants' assertion that Mary Klein was the closest next of kin for purposes of R.C. 517.23, that step would not lead this court to conclude that appellees Carney, Carney, and Howard lacked standing to pursue a claim for the mistreatment of their grandmother's remains. Instead, this court rejects the theory that a surviving custodian has quasi-property rights in the body of the deceased, and acknowledges the cause of action for mishandling of a dead body as a sub-species of the tort of infliction of serious emotional distress.

(Footnotes omitted.) *Carney* at 36-37.

{¶ 45} Subsequently, our district considered whether a trial court had erred in deciding that a husband's right to possess his deceased wife's body for burial was protected under the

Fourteenth Amendment against an unreasonable search and seizure. *Everman v. Davis*, 54 Ohio App.3d 119, 120, 561 N.E.2d 547 (2d Dist.1989). Even though the husband (Everman) told the hospital that he did not want an autopsy of his wife, who had been in a car accident, the coroner was not told of this and performed an autopsy. *Id.* We noted that "[t]here is no issue in this case of the possessory right of a spouse or other appropriate member of the family to the body of the deceased person for the purpose of preparation, mourning and burial. This right is recognized by law and by the decisions. See R.C. 313.14. This is not to say that a corpse may not be temporarily held for investigation as to the true cause of death." *Id.* at 122. We went on to note that the search and seizure was not "unreasonable" for purposes of the Fourteenth Amendment, because "the function of the coroner necessitates a temporary delay of burial rights in the public interest." *Id.*

{¶ 46} While this might imply the recognition of a property interest, we further observed that:

The argument that a dead body is an "effect" within the meaning of "houses, papers and effects" stretches the imagination and the language of the amendment. Words used in a series apply to the same person or similar objects unless the context otherwise requires. Nothing in this language suggests that, despite the respect due to the dead, the body of the former person is the "effect" of anyone else. The word "effects" in legal and common usage includes real or personal property and as used in the Constitution does not necessarily include the right of immediate possession of the dead body of a human being. The compelling interest of the state in determining the true cause of death of a body

found on the highway overrides the interest of relatives to immediate possession
for burial.

*Everman* at 122.

{¶ 47} In *Brotherton*, the Sixth Circuit Court of Appeals considered whether the wife of a decedent possessed a property right in her husband's body for purposes of asserting a Section 1983 action against a coroner for improper removal of the husband's corneas. 923 F.2d at 478. In order to decide this issue, the court of appeals looked to state law, and noted that the Supreme Court of Ohio had not yet ruled on the issue. *Id.* at 480. Citing cases outside Ohio's jurisdiction, the court of appeals stated that "[a] majority of the courts confronted with the issue of whether a property interest can exist in a dead body have found that a property right of some kind does exist and often refer to it as a " 'quasi-property right.' " (Citations omitted.) *Id.* The court then commented that " [h]owever, two Ohio appellate courts which have been confronted with determining the nature of the right have avoided characterizing it in this manner." *Id.*, citing *Carney,* 33 Ohio App.3d at 35-37, 514 N.E.2d 430, and *Everman*, 54 Ohio App.3d at 122, 561 N.E.2d 547.

{¶ 48} After stressing the "extremely broad and abstract" concept of property, the court of appeals noted that it "most often refers not to a particular physical object, but rather to the legal bundle of rights recognized in that object" and that "[t]he 'bundle of rights' which have been associated with property include the rights to possess, to use, to exclude, to profit, and to dispose." *Brotherton* at 481. The court then stated that:

Though some early American cases adopted the English common-law rule that there was no property right in a dead body, other cases held that the rule was

unsound in light of the rights of next of kin with regard to burial. The tendency to classify the bundle of rights granted by states as a property interest of some type was a direct function of the increased significance of those underlying rights. The prevailing view of both English and American courts eventually became that next of kin have a "quasi-property" right in the decedent's body for purposes of burial or other lawful disposition. *See Spiegel v. Evergreen Cemetery Co.*, 117 N.J.L. 90, 93, 186 A. 585, 586 (1936) ("it is now the prevailing rule in England as well as in this country, that the right to bury the dead and preserve the remains is a quasi-right in property....").

The importance of establishing rights in a dead body has been, and will continue to be, magnified by scientific advancements. * * * The human body is a valuable resource. * * * As biotechnology continues to develop, so will the capacity to cultivate the resources in a dead body. A future in which hearts, kidneys, and other valuable organs could be maintained for expanded periods outside a live body is far from inconceivable.

Thankfully, we do not need to determine whether the Supreme Court of Ohio would categorize the interest in the dead body granted to the spouse as property, quasi-property or not property. Although the existence of an interest may be a matter of state law, whether that interest rises to the level of a "legitimate claim of entitlement" protected by the due process clause is determined by federal law. This determination does not rest on the label attached to a right granted by the state but rather on the substance of that right.

(Citations omitted.) *Brotherton,* 923 F.2d at 481-82.

{¶ **49**}    The court of appeals, therefore, concluded as follows:

Ohio Rev.Code § 2108.02(B), as part of the Uniform Anatomical Gift Act governing gifts of organs and tissues for research or transplants, expressly grants a right to Deborah Brotherton to control the disposal of Steven Brotherton's body. *Everman* expresses the recognition that Deborah Brotherton has a possessory right to his body. 54 Ohio App.3d at 121, 561 N.E.2d 547.   *Carney* allows a claim for disturbance of his body. 33 Ohio App.3d at 37, 514 N.E.2d 430.   Although extremely regulated, in sum, these rights form a substantial interest in the dead body, regardless of Ohio's classification of that interest.   We hold the aggregate of rights granted by the state of Ohio to Deborah Brotherton rises to the level of a "legitimate claim of entitlement" in Steven Brotherton's body, including his corneas, protected by the due process clause of the fourteenth amendment.

*Brotherton* at 482.

{¶ **50**}    The *Brotherton* case was litigated for more than ten years, and eventually resulted in certification of a class action against the Hamilton County coroner, based on the coroner's policy of " 'intentional ignorance,' encouraging subordinates not to seek information on objections to corneal removal."   *Brotherton v. Cleveland*, 141 F.Supp.2d 894, 898 (S.D.Ohio 2001).   The class action ultimately was settled on terms that included, among other things, payment of $5,250,000 into a settlement fund, and a consent decree  requiring the Hamilton County Coroner and the Cincinnati Eye Bank for Sight Restoration to agree to "cease and desist in harvesting corneas of autopsy subjects without consent of the next of kin or others with

appropriate authority to consent." *Id.* at 901. The federal district court approved the settlement in February 2001. *Id.* at 907.

**{¶ 51}** Another lawsuit was filed against the Hamilton County Coroner, this time based on the coroner's removal of a decedent's brain for examination and use of a technique that required two weeks for the brain to solidify. In these situations, the coroner disposed of the remains of the brain after examination and did not notify the decedent's family that the examination was complete. *See Hainey v. Parrott*, S.D. Ohio No. 1:02-CV-733, 2005 WL 2397704, *1 (Sept. 28, 2005). A class was again certified in that case in August 2004. *Id.* at *2. While recognizing some factual differences between *Brotherton* and the case at hand, the district court denied the defendants' motion for summary judgment, based on the fact that the plaintiffs had "a cognizable constitutional property interest in their decedent's body parts which the coroner's office violated when it disposed of their decedents' brains without prior notice." *Id.* at *6.

**{¶ 52}** In particular, the district court relied on "the broad holding in *Brotherton* that there is a substantial and protectable constitutional interest in the dead body of a relative or loved one." *Id.* at *5. The court also relied on R.C. 313.14, which gave the decedent's next of kin "the right of ultimate disposition of the body," and *Everman*, which recognized that R.C. 313.14 "creates a 'possessory right of a spouse or other appropriate member of the family to the body of the deceased person for the purpose of preparation, mourning, and burial.' " *Id.*, quoting *Everman*, 54 Ohio App.3d at 122, 561 N.E.2d 547.

**{¶ 53}** A settlement of the class action was also approved in *Hainey* in September 2007, with creation of a $6,000,000 settlement fund, incentive awards of $50,000 for the named

plaintiffs, and an agreement by defendants that "notice will be provided to persons claiming a decedent from the morgue that an organ is being retained for examination, the identity of the organ, and how the organ can be claimed when the examination is complete." *Hainey v. Parrott*, 617 F.Supp.2d 668, 673 (S.D.Ohio 2007).

{¶ 54} Shortly after *Hainey* was filed, the Albrechts filed a "nearly identical" lawsuit as a putative class action against the Clermont County Coroner and Commissioners, and 86 other Ohio county coroners and commissioners – in other words, against the remaining county coroners in Ohio. See *Albrecht v. Treon*, S.D. Ohio No. 1:06cv274, 2007 WL 777864, *1 (Mar. 12, 2007) (*Albrecht* I). The claim in this case, like *Hainey*, was based on the removal of a decedent's brain and the failure to notify the parents that their son's brain had been removed. *Id.*

{¶ 55} Notably, in 2006, the Ohio legislature enacted R.C. 313.123, which provided that, with limited exceptions, "tissues, organs, blood, other bodily fluids, gases, or any other specimens from an autopsy are medical waste and shall be disposed of in accordance with applicable federal and state laws, including any protocol rules adopted under section 313.122 of the Revised Code." R.C. 313.123(B)(1), effective August 17, 2006. This legislation, however, did not apply either to *Hainey* or to *Albrecht*, because the events in those cases occurred prior to the enactment of the statute.

{¶ 56} Based on the contention that *Hainey* had improperly expanded Sixth Circuit precedent and had misinterpreted the law of Ohio, the coroners and county commissioners asked the federal district court in *Albrecht I* to certify the following question to the Supreme Court of Ohio:

Whether the next of kin of a decedent, upon whom an autopsy has been

performed, have a property right under Ohio law in the decedent's tissues, organs, blood or other body parts that have been removed and retained by the coroner for forensic examination and testing.

*Albrecht I* at *2.

{¶ 57} In January 2008, the Supreme Court of Ohio answered the question in the negative, holding that "the next of kin of a decedent upon whom an autopsy has been performed do not have a protected right under Ohio law in the decedent's tissues, organs, blood, or other body parts that have been removed and retained by the coroner for forensic examination and testing." *Albrecht v. Treon*, 118 Ohio St.3d 348, 2008-Ohio-2617, 889 N.E.2d 120, ¶ 8 (*Albrecht II*).

{¶ 58} The Supreme Court of Ohio first discussed the holding in *Brotherton*, and concluded that its specific holding regarding removal of corneas for purposes unrelated to an autopsy was not relevant because it involved "R.C. Chapter 2108, the Anatomical Gift Act, as it related to removal of corneas from autopsy subjects for use by eye banks." *Id.* at ¶ 19. Likewise, the court distinguished *Everman* because it involved "the denial of a right to bury a decedent," and *Carney*, because it involved "the unauthorized disturbance of a body." *Id.* at ¶ 22.

{¶ 59} The court then discussed another Sixth Circuit decision that had found an insufficient liberty or property interest in a state notice statute for purposes of creating a valid due process claim. In that case, the coroner had performed an autopsy on a decedent without the consent of the next of kin. *Id.* at ¶ 23, citing *Montgomery v. Clinton Cty.*, 940 F.2d 661, 1991

WL 153071 (6th Cir.1991)(Table).[3]   In this regard, the Supreme Court of Ohio noted that although the *Montgomery* case had involved Michigan law, "the Sixth Circuit found that the Michigan statute did not create a sufficient interest to support a due-process claim for the coroner's failure to give notice before the autopsy."  *Id.*

{¶ 60}   In addition, the Supreme Court of Ohio discussed the decision in *Hainey,* observing that "[t]he *Hainey* court expanded the holding of *Brotherton* to apply to situations in which the coroner removed and retained organs for additional forensic examination and testing, a procedure that the coroner is clearly authorized by statute to do."  *Id*. at ¶ 27.   The court then stated that "*Hainey's* expansion of *Brotherton* is unsupported by Ohio law."   One of the first points stressed in this regard was that after the acts giving rise to the claims in *Albercht I*, Ohio's General Assembly had enacted R.C. 313.123, which classified autopsy specimens as "medical waste," and allowed coroners to dispose of the specimens as such.  *Id.* at ¶ 28.

{¶ 61}   The Supreme Court of Ohio observed, however, that even before R.C. 313.123 was enacted, the next of kin had no "protected right" in autopsy specimens.  *Albrecht II,* 118 Ohio St.3d 348, 2008-Ohio-2617, 889 N.E.2d 120, at ¶ 29.  As support, the court discussed various statutes giving the coroner the right to examine bodies and to retain specimens for long periods of time.  *Id.* at ¶ 29-35.  Although the court acknowledged, in passing, the right of the

---

[3]   *Montgomery* involved a Michigan statute which, at the time, stated that a "medical examiner is to use diligent effort to notify the next of kin but may order the autopsy whether or not the next of kin consents."  *Montgomery,* 940 F.2d 661, 1991 WL 153071, at *1, citing Mich.Comp.Laws Ann. 52.205(4).   Ironically, this law was amended in 2010 to require coroners to notify relatives of the decedent of the coroner's retention of entire organs or limbs and allow the relatives to request the return of the organ or limb.   *See* Mich.Comp.Laws Ann. 52.205(6), as amended by H.B. No. 4893, Public Act No. 108, effective July 1, 2010.   Any remaining retained body portions may be disposed of as waste.   *Id.* at 52.205(6)(b). This latter provision is similar to R.C. 313.123, which was enacted in August 2006.

next of kin to dispose of a body pursuant to R.C. 313.14, the court stressed that this "right does not arise until after the coroner has performed his duties and does not include forensic specimens that were retained by a coroner for forensic examination and testing." *Id.* at ¶ 36.

{¶ 62} After making these observations, the court mentioned other Ohio cases which, "prior to *Brotherton*, held that a dead body is not property." *Id.* at 37. (Citations omitted.) The court also cited cases from other jurisdictions. For example, in Arkansas, while a quasi-property right to a dead body had been recognized, it was not extended to all of the body's organs. *Id.* at ¶ 38, citing *Fuller v. Marx*, 724 F.2d 717 (8th Cir. 1984). Further, in Colorado and Kansas, courts had held that no property right in a decedent's body existed that would support an action for conversion. *Albrecht II*, at ¶ 39-40.

{¶ 63} Notably, one of the cited cases involved a situation quite similar to the present. *See Culpepper v. Pearl St. Bldg., Inc.,* 877 P.2d 877 (Colo.1994). In *Culpepper*, the plaintiffs' son was mistakenly released for a cremation that had been approved for another morgue resident. When his parents discovered the mistake, they sued the crematory, the transportation company, the county, and several employees of each organization, individually. *Id.* at 879. In concluding that the plaintiffs could not maintain an action for conversion, the Supreme Court of Colorado stated that:

> We formally reject the fictional theory that a property right exists in a dead body that would support an action for conversion. Rather, an injury like that suffered by the Culpeppers is more properly addressed through a tort action related to the infliction of emotional distress or to mental anguish caused by willful, wanton, or insulting conduct, or through an action for breach of contract

and accompanying mental suffering.

*Id.* at 882.

**{¶ 64}**  Finally, the Supreme Court of Ohio stated that:

We are mindful of the right of a decedent's next of kin to attend to the proper preparation and burial or cremation of the body.  But nothing in the United States Constitution, the Ohio Constitution, Ohio statutes, or common law establish a protected right in autopsy specimens in Ohio.  *R.C. 313.14 simply clarifies whom the coroner should contact to make funeral arrangements.* The interest that Ohio statutes at issue here give next of kin in an autopsied decedent's body is to inter or cremate the body after the autopsy has been performed.

(Emphasis added.)  *Albrecht II,* 118 Ohio St.3d 348, 2008-Ohio-2617, 889 N.E.2d 120, at ¶ 41.

**{¶ 65}**  In view of the many remarks that the Supreme Court of Ohio made denigrating the concept of property rights in a decedent's body, as well as the court's observation that R.C. 313.14 merely clarifies the persons whom a coroner should contact for funeral arrangements, it would be difficult to conclude that a property right sufficient to invoke the protection of the Fourteenth Amendment existed, i.e., that Shott's conduct violated "clearly established federal rights of which a reasonable person would have known."    *Cook*, 103 Ohio App.3d at 85, 658 N.E.2d 814, citing *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727, 73 L.Ed.2d 396.

**{¶ 66}**  Subsequently, the Sixth Circuit Court of Appeals also interpreted *Albrecht II* broadly, indicating that while the Supreme Court of Ohio answered the particular certified question posed, "[t]he full language of the opinion makes it clear that the Ohio Supreme Court was determining whether the 'state law in effect at the time of the incident gave [the surviving

parents] a property interest in their deceased son's body parts.' " *Albrecht v. Treon*, 617 F.3d 890, 896, fn. 3 (6th Cir.2010) (*Albrecht III*), quoting *Albrecht II* at 351.[4]

{¶ 67}  Furthermore, while the Sixth Circuit Court of Appeals did not directly overrule *Brotherton*, it noted that *Brotherton* applies only "in the narrow circumstance of unauthorized removal of body parts for donations, and should not be expanded to include claims by next of kin for bodily tissues retained by a government official for legitimate criminal investigations." *Albrecht III* at 897, citing  *Waeschle v. Dragovic*, 576 F.3d 539, 546-547 (6th Cir.2009), and *Albrecht II* at 353.

{¶ 68}  A more recent case has also concluded that the property right in *Brotherton* is limited to cases involving Ohio's Anatomical Gift Act.  See *Range v. Douglas*, 878 F.Supp.2d 869, 883 (S.D.Ohio 2012).  However, in an appeal of that case, which was based on violations of substantive due process, the Sixth Circuit Court of Appeals stated that:

> At least one of our sister circuits has found that the "common law right to noninterference with a family's remembrance of a decedent" is so rooted in our traditions that publication of death photos is a deprivation under the Fourteenth Amendment.  *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir.2012); see also *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 164-65, 168, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004) (suggesting in a FOIA case that family members of the deceased had a right to privacy over death-scene photos and noting that a family's control over a body has been long-recognized at common

---

[4]  Although *Albrecht III* was decided in August 2010, after the events at issue in this litigation, its interpretation of the Supreme Court of Ohio's decision in *Albrecht II* lends support to the conclusion that the alleged property right was not "clearly established" such that a reasonable official would have believed that the person asserting it was entitled to constitutional due process.

law). We have also found, in the context of procedural due process claims, that relatives have at least a property interest in the bodies of deceased relatives. *Whaley v. Cnty. of Tuscola*, 58 F.3d 1111 (6th Cir.1995) (holding that next-of-kin has a constitutionally protected property interest in the bodies of the deceased relatives); *Brotherton v. Cleveland*, 923 F.2d 477, 481-82 (6th Cir.1991) (holding that a widow has a constitutional entitlement to her husband's body, including his corneas); *see also Newman v. Sathyavaglswaran*, 287 F.3d 786, 796-97 (9th Cir.2007) (holding that parents have a procedural due process property right in the corneas of their deceased children).

*Range*, 763 F.3d at 588-89.

{¶ 69} Without ruling on the precise nature of the right, the court of appeals affirmed the grant of summary judgment in favor of the defendants, concluding that their actions did not shock the conscience and did not violate the substantive due process rights of the plaintiffs. *Id.* at 591-592.

{¶ 70} Thus, to say that the law is unsettled on the issue of property rights would not be an overstatement. *Compare Shelley v. Cty. of San Joaquin*, 954 F.Supp.2d 999, 1004 (E.D.Cal.2013)(*Shelley I*) (noting that "the content of the asserted constitutional right – next of kins' property interest in the remains of their relatives – was not 'beyond debate' at the time of the challenged conduct."); and *Shelley v. Cty. of San Joaquin*, 996 F.Supp.2d 921, 930 (E.D.Cal.2014) (*Shelley II*) (concluding in situation involving improper disinterment of body that the decedent's family did "not have a legitimate claim of entitlement property interest sufficient to support a procedural due process claim.").

{¶ 71}    In this regard, the federal district court in *Shelley I* noted that the United States Supreme Court has "not addressed this question, let alone decided it. The few U.S. Courts of Appeals that have considered the question have sharply divided."   *Id*. at 1004, citing *Waeschle v. Dragovic*, 687 F.3d 292, 295 (6th Cir.2012), and *Newman*, 287 F.3d 786, 796-797 (9th Cir.2002) (taking contrary positions).   The federal district court in *Shelley I* stressed that "[a]s more than one scholar has observed, whether a person has a property interest in the remains of her relatives is still an open question."   *Shelley I* at 1004. Accordingly, we conclude that Mrs. Granato's asserted property right was not so clearly established that a reasonable official such as Shott would have believed that Mrs. Granato was entitled to constitutional due process.

{¶ 72}    Furthermore, even if Granato had a property right, random and unauthorized deprivations of property by state actors are not violations of the procedural requirements of due process, if meaningful post-deprivation remedies are available.   *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), In *Hudson*, the Supreme Court of the United States extended its prior decision in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), to intentional deprivations of property.   In this regard, the court made the following observations:

> While *Parratt* is necessarily limited by its facts to negligent deprivations of property, it is evident, as the Court of Appeals recognized, that its reasoning applies as well to intentional deprivations of property. The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur.

We can discern no logical distinction between negligent and intentional deprivations of property insofar as the "practicability" of affording predeprivation process is concerned. The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct. Arguably, intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent.

If negligent deprivations of property do not violate the Due Process Clause because predeprivation process is impracticable, it follows that intentional deprivations do not violate that Clause provided, of course, that adequate state post-deprivation remedies are available. Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

(Footnotes omitted.) *Hudson* at 533.[5]

**{¶ 73}** In *Hudson*, the court looked to the availability of common law remedies that would provide a remedy for the property loss. *Id.* at 534-535. The court found that the

---

[5] *Parratt* was subsequently overruled on other grounds in *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), which held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."

presence of these remedies was adequate. In fact, the court rejected the plaintiff's argument that relief under state law was " 'far from certain and complete' because a state court might hold that petitioner, as a state employee, is entitled to sovereign immunity." *Id.* at 535. In this regard, the court noted that claims for intentional torts would not be barred under the state's immunity law. *Id.*

**{¶ 74}** In the case before us, the acts leading to the release of the bodies were random and unauthorized; in fact, Shott's actions violated established procedure in the coroner's office. Furthermore, Mrs. Granato has an available remedy under state law, which is not barred by sovereign immunity, meaning that "the State has provided an adequate postdeprivation remedy for the alleged destruction of property." *Hudson* at 536.

### B. Substantive Due Process

**{¶ 75}** "Substantive due process is '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.' " *Range*, 763 F.3d at 588, quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir.1992). "It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.' " *Id.*, quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-250 (6th Cir.2003). "It also protects the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions." *Id.*, quoting *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir.2003). (Other citation omitted.)

**{¶ 76}** *Shelley II* involved a situation in which the police received information that a murder victim's body was at the bottom of an abandoned well, along with the bodies of other victims. According to the complaint, the defendants " 'ordered the well to be rapidly and completely dug up with a back hoe.' " (Citation to record omitted.) *Shelley II*, 996 F.Supp.2d at 923. They also " 'ordered the digging with the back hoe to continue after bones were discovered.' " *Id.* " 'Thereafter, in the presence of [the plaintiff], and with invited television and news organizations observing, Defendants ... caused the skeletal remains of [the decedent] ... to be chewed up, pulverized, destroyed, crushed and commingled with other unknown murder victims ....' " *Id.* at 923-924. The complaint further alleged that when the remains were released for cremation, at least three or more individuals were contained in the bag of bones, and not all of the decedent's remains were turned over. *Id.* at 924.

**{¶ 77}** In addition to asserting a procedural due process right based on property interests, the plaintiffs alleged that they had been deprived of their " 'substantive due right to family integrity' because Defendants' conduct was 'likely to cause the family profound grief' and thereby shock the conscience – a substantive due process claim." *Id.* at 925. In assessing these claims, the court first concluded that the plaintiffs did "not have a legitimate claim of entitlement property interest sufficient to support a procedural due process claim" and upheld the dismissal of that claim. *Shelley II*, 996 F.Supp.2d at 930-931. The court did conclude, however, that a claim had been stated for violation of the plaintiffs' substantive due process rights, under the circumstances as alleged. *Id*. at 931-932, relying on *Marsh*, 680 F.3d at 1154, which had recognized " 'a parent's right to control a deceased child's remains ... [which] flows from the well-established substantive due process right to family integrity.' "

**{¶ 78}**     Before discussing this matter further, we note that Mrs. Granato did not raise such a due process right in the trial court, nor did the trial court discuss this matter in its decision. Instead, the court confined itself to a discussion solely of the issue of property rights in a deceased person's body. In addition, neither party has raised the issue of substantive due process on appeal.

**{¶ 79}**     In *Range*, the Sixth Circuit Court of Appeals offered the following guidance on evaluating substantive due process claims:

> Over the years, the courts have used several tropes to explain what it means to shock the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Conduct shocks the conscience if it "violates the 'decencies of civilized conduct.' " *Id.* at 846, 118 S.Ct. 1708. Such conduct includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Id.* at 847, 118 S.Ct. 1708. These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation. *See id.* at 847-48, 118 S.Ct. 1708.

> Our cases recognize the difficulty of determining where conscience-shocking behavior resides on the continuum of actions. The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is "intended to injure" without any

justifiable government interest, most clearly rises to the "conscience-shocking" level. *Id.* at 848-49, 118 S.Ct. 1708. Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a "matter for closer calls." *Id*. at 849, 118 S.Ct. 1708. These middle states of culpability "may or may not be shocking depending on the context."_ *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ*., 542 F.3d 529, 535 (6th Cir.2008). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708.

We have identified several considerations that bear on the question of whether deliberate indifference amounts to conscience-shocking behavior: 1) the voluntariness of the plaintiff's relationship with the government, 2) whether there was time for the government actor to deliberate, and 3) whether the government actor was pursuing a legitimate governmental purpose. *Hunt*, 542 F.3d at 536. A critical question in deliberate indifference cases is "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir.2002) (internal quotation marks omitted). So a police officer who exhibits a reckless disregard for life during a high-speed chase does not shock the conscience because the circumstances require instant judgment, *Lewis*, 523 U.S. at 853-54, 118 S.Ct. 1708 (discussing *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88

L.Ed.2d 662 (1986)), but an officer who has five hours to decide whether to use tear gas and forced entry during a standoff might shock the conscience if the officer is deliberately indifferent to the risks posed to hostages, *Ewolski*, 287 F.3d at 511-12.

*Range*, 763 F.3d at 589-90.

**{¶ 80}** *Range* involved a situation in which a morgue attendant sexually abused an untold number of murder victims held at the Hamilton County Morgue over the course of many years, while high or drunk, and on duty. *Id.* at 578. The attendant, as well as his supervisor (Kersker), the Hamilton County Coroner (Dr. Cleveland), and other county defendants, were sued by family members of the women, on several grounds, including a claim under 42 U.S.C. 1983.

**{¶ 81}** On appeal, the Sixth Circuit Court of Appeals considered whether the trial court had acted properly with respect to summary judgment on the basis of immunity, both state and federal. The court held that statutory immunity under R.C. 2744.03(A)(5) was properly denied to Hamilton County, because there was evidence that the attendant's supervisor, Kersker, " '[disregard[ed] a known risk substantially greater than that necessary to make the conduct negligent.' " *Id.* at 586. (Citation omitted.) The court of appeals further held that Kersker and Dr. Cleveland were not entitled to statutory immunity under R.C. 2744.03(a)(6)(b), due to evidence indicating that their failures were wanton or reckless. *Id.* at 586-587.

**{¶ 82}** However, after relating the standards pertaining to substantive due process, the court of appeals also concluded that "[v]iewing the facts in the light most favorable to Plaintiffs, a jury could find much to condemn in the conduct of Kersker and Dr. Cleveland, perhaps even

recklessness. But a jury could not conclude that these Defendants were aware of facts from which they could infer a substantial risk of the kind of serious harm that occurred here, that they did infer it, and that they acted with indifference toward the rights of the families involved. We simply cannot say that the behavior of these Defendants could show deliberate indifference to Plaintiffs' constitutionally protected rights such that their actions 'shock the conscience.' " *Range*, 763 F.3d at 591-92.

{¶ 83} Likewise, in the case before us, even though there are genuine issues of fact regarding Shott's recklessness that preclude summary judgment in his favor for purposes of Ohio's statutory immunity, a jury could not conclude that Shott acted with deliberate indifference such that his actions would shock the conscience. The situation in the case before us differs significantly from the conduct involved in *Shelly II*. Even under the undisputed facts, there is nothing to indicate that Shott's conduct falls within the requirements for a substantive due process claim. Accordingly, the trial court erred in denying summary judgment to Shott based on the issue of qualified immunity under 42 U.S.C. Section 1983.

{¶ 84} In light of the preceding discussion, Shott's sole assignment of error is overruled in part and is sustained in part.

{¶ 85} As a final matter, we note that Mrs. Granato has filed a motion for leave to file a sur-reply, based on her contention that Shott's reply brief improperly attempts to place blame on Dr. Armstrong for the tragedy that occurred. We have reviewed the motion, and find it not well-taken. Accordingly, the motion is overruled.

III. Conclusion

{¶ 86}    Shott's sole assignment of error having been overruled in part and sustained in part, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court for further proceedings.

. . . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Richard W. Schulte
Stephen D. Behnke
Laura G. Mariani
John Cumming
Hon. Mary Lynn Wiseman