CLAY, Circuit Judge,
dissenting.
DISSENT
Fundamentally, due process is about fairness with respect to how the government exercises its authority when a person’s property rights are at issue. The Due Process Clause requires, among other things, that the government afford individuals with notice and an opportunity to be heard prior to the deprivation of a protected property interest; due process also requires that government refrain from engaging in arbitrary and capricious exercise of authority that impacts an individual’s rights. The City of Howell in this instance failed to comply with either of these constitutional requirements.
By way of summary, the City informed David Shoemaker that it owned the berm in front of his home — when it sought to relandscape that berm without seeking Shoemaker’s advice or consent. At a later date, the City took the contrary position that Shoemaker was in fact the true owner of that very same berm and demanded that Shoemaker maintain the property, and incur the expense of doing so, as re-landscaped by the City without Shoemaker’s consent. After Shoemaker refused, the City billed him for the cost of the berm’s maintenance, without affording him an opportunity to contest the purported obligation, which had been unceremoniously decreed by the City. And when Shoemaker did not promptly honor the disputed bill, the City effectively extorted payment by placing a tax lien on his home. There is nothing fair about the character or substance of the City’s actions in this case; nor is there any fairness to be found in the absolute lack of process afforded to Shoemaker throughout his saga with the City of Howell. Viewing things differently than the majority, I therefore respectfully dissent.
BACKGROUND
Shoemaker purchased his home at the corner of S. Elm and E. Sibley Streets in the City of Howell, Michigan, in 2003. At that time, the berm that ran along Elm Street was narrow. Planted on that berm was a large tree. The berm that ran along Sibley Street in front of Shoemaker’s home was also narrow. Believing that the berms were part of his property, Shoemaker regularly mowed those areas along with the lawn that surrounded his home. Because the berms were narrow and unencumbered, Shoemaker only needed to make two passes with his lawnmower to complete the task of keeping those areas well-maintained. The additional effort was minimal.
Beyond simply maintaining the berms, Shoemaker undertook efforts to improve the property surrounding his home. *569 Shortly after moving to the corner of S. Elm and E. Sibley Streets, Shoemaker and his minor daughter selected, purchased, and then planted a five-foot tall red maple tree in the berm running along Sibley. Thereafter, Shoemaker and his daughter watched year after year as this tree grow taller, and Shoemaker continued mowing the grass surrounding his property, until a series of events in 2009 interfered with his interest in maintaining the berms.
In 2009, the City undertook a project to replace certain gutters and to “improve” the berms running alongside the roads. Around the same time that the City was tearing up the existing gutters that were buried along the edge of Elm Street, a large branch broke from the old tree that was situated on that land and crashed on top of Shoemakers van, causing $9,000 worth of damage. Shoemaker contacted the City, believing that the incident had been the result of the nearby construction. He also worried that he might have to remove the tree. But the workers sent by the City to inspect the damage told Shoemaker that he had no say in what happened to the tree because it was not planted on his property, inasmuch as the berm belonged to the City. Following that incident, the City began working on the berm running alongside of Shelby Street, where Shoemaker had planted the red maple tree with his daughter. The City uprooted Shoemaker’s maple tree over his objections, again telling him that the property between the sidewalk and the street was owned by the City. The City then increased the width of the berm by narrowing the street with the placement of a new curb further from Shoemaker’s home. And on this larger block of grass, the City planted nine saplings; each supported by a web of guidewires. It was only at this point — after his tree had been ripped from the ground and the once narrow berm had simultaneously become wider and more difficult to mow — that Shoemaker determined to stop maintaining the reconfigured and relandscaped strip of land that ran adjacent to the sidewalk on Shelby Street in front of his home.
Subsequently, the City’s Code Enforcement Officer became aware that Shoemaker was not mowing the grass on the berm. Finding that the growth on the berm was in violation of City Ordinance § 622.02(a), the Officer warned Shoemaker (by way of several written communications either sent through the mail or affixed to Shoemaker’s door) that the City’s ordinances required Shoemaker to maintain the property. The provision in question reads as follows:
a) Cutting and Removal. No owner, lessee or occupant ... having control of any occupied or unoccupied lot or land or any part thereof in the City, shall permit or maintain on any such lot or land, or on or along the sidewalk, street or alley adjacent to the same between the property line and the curb ... any growth of weeds, grass or other rank vegetation to a greater height than eight inches on the average.... No person shall neglect to cut ... weeds, grass or other vegetation as directed in this section, or fail, neglect or refuse to comply with the provisions in this section, or resist or obstruct the City Manager or his or her authorized agent in the cutting and removal of weeds, grass and other vegetation.
e) Noncompliance; Remedy of the City. If the provisions of the foregoing subsection are not complied with, the City Manager or his duly authorized representative shall serve notice upon the owner, lessee, or occupant ... to comply with the provisions of this section. Such notice shall be given verbally to any of such persons or in writing. If in writing, it shall be sent first class mail to the owner of record of the lot or land in question.... If the person upon whom the notice is served fails, neglects or *570 refuses to cut, remove or destroy ... such weeds, grass, trees or other vegetation within five business days form the date of such notice.... the City Manager shall cause such weeds, grass, trees and other vegetation to be removed or destroyed and the actual cost of such cutting, removal or destruction, plus an administrative fee of seventy-five dollars ... shall be certified to by the City Manager or his or her duly authorized representative and shall become and be a lien upon the property on which such weeds, grass, trees and other vegetation were located. A statement for such actual costs plus administrative fee shall thereupon be sent by first class mail to the property owner....
Ordinance § 622.02.
The standoff between the Enforcement Officer and Shoemaker reached its climax in August 2011. On August 18, 2011, after having left several violation notices on Shoemaker’s door, the Officer spoke directly with Shoemaker’s daughter and left a “final notice” demanding that Shoemaker bring the berm into compliance with the ordinance by cutting the overgrown vegetation. The notice left by the Officer was scant; it included only the fact that the City was charging Shoemaker with having violated “Ord. § 622.02” for “tall grass + weeds,” the anticipated date of reinspection (August 19, 2011), and a phone number for “Code Official” number 24, presumably the Enforcement Officer who scrawled the notice. See Appendix I. But most significantly, the letter was absolutely devoid of any indication that Shoemaker had the right to challenge the purported violation, let alone any information regarding how he could initiate such a challenge.[1] See id.
Displeased with how the Enforcement Officer had spoken to his daughter, Shoemaker contacted the City, which prompted a return phone call from the Officer on August 23, 2011. The Enforcement Officer apologized for the misunderstanding, but reaffirmed his position that Shoemaker was responsible for mowing the berm. When Shoemaker protested, relaying the message conveyed to him by City workers — namely, that the land was not Shoemaker’s property. The Officer “concurred” with that assessment, but maintained his position that maintenance of the land was nonetheless Shoemaker’s responsibility alone. (R. 26-12, Officer’s Notes, PGID 651). Shoemaker asked to be ticketed so that he could challenge the ordinance as applied to him under these circumstances. Notably, the letters that the .Enforcement Officer had previously sent to Shoemaker indicated that a ticket would be issued upon the failure to mow the disputed property. Yet, instead of issuing a ticket, the Officer sent Shoemaker an invoice for $150 (inclusive of administrative fees) after having directed the City’s contractor to mow the berm.
This process repeated itself in October 2011. The vegetation growing on the disputed strip of property became unkempt, the Enforcement Officer sent another letter to Shoemaker, and he again directed the City’s contractor to mow the property for the exorbitant price of $75. The Enforcement Officer thereafter sent Shoemaker an invoice for $450, a price that included a $250 civil fine on top of a $75 administrative fee.[2] The invoices sent to *571 Shoemaker, like each of the letters and the door hanger notices delivered before them, lacked any indication that Shoemaker could challenge the purported violation of the ordinance or, in the alternative, challenge the ordinance itself (as applied to him). See Appendix II.[3] Moreover, the invoices certainly offered no information as to how any challenge could be initiated. See id. The invoices simply demanded payment.
When Shoemaker refused to pay the invoices, a $600 charge was added to his property taxes as a lien against his home. But Shoemaker, like many Americans, had a mortgage on his home. And as is common with home mortgages, a copy of Shoemaker’s tax bill was sent directly to the bank that held the mortgage. Shoemaker had no opportunity to contest the charge because the City’s extortion was completed when the bank paid the additional sum from Shoemaker’s mortgage escrow account that was reserved for his property taxes. Fearing that the City would next require him to maintain some other property, the existence of which could be purported to give him some marginal benefit, Shoemaker sold his home at a loss and removed himself from Howell, the City where he had gone to high school and college, and where he had lived for most of his life.
DISCUSSION
I. Procedural Due Process
Procedural due process, at a minimum, requires that the government, prior to depriving an individual of a property right, provide the affected individual with notice of the charges and a meaningful opportunity to contest the factual basis for those charges. Morrison v. Warren, 375 F.3d 468, 473 (6th Cir.2004) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The notice commanded by due process requires more than the mere indication of the government’s intent to act against the affected individual; it must be must be “reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.” Mullane, 339 U.S. at 314, 70 S.Ct. 652. The “right to be heard has little reality or worth unless one is informed” of his ability “to appear or default, acquiesce or contest.” Id.
The majority contends that Shoemaker’s claim is doomed simply because he failed to dispute one aspect of the charges against him — the height of the grass — and, in support of this plainly faulty contention, the majority cites a string of irrelevant out-of-Circuit cases that fail to support the majority’s position. See Maj. Op. at 562-63. Due process requires an opportunity to be heard with respect to all of the materially relevant “disputed issues of fact” that form the basis for the charges. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 590, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); 16C C.J.S. Constitutional Law § 1495 (2015) (“Due process of law implies the right to contradict by proof every material fact which bears on the question of right involved.”). Shoemaker was willing to mow the grass, so long as he owned the berm. He proved that point by mowing the grass up until the City dictated that it was the true owner of that property. It is beyond questioning that Shoemaker disputed the charges against him, inasmuch as he denied ownership over the property after the City had summarily taken the property, therefore making him not re *572 sponsible for cutting the overgrown grass. For that reason, the City was required to afford him adequate notice and a meaningful opportunity to be heard. The City failed with respect to both of those obligations.
A. Insufficient Notice
The panel’s inquiry into this case should have ended with the insufficiency of the notice provided by the City, before even considering what process was required under Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976): Quite frankly, it is completely baffling as to why the majority pronounces that “[t]he record clearly establishes that the City provided Shoemaker with ample notice of the allegations against him,” as if notice of the allegations on their own could satisfy due process. See Maj. Op. at 559-60. The notice itself was clearly deficient because it was not “reasonably calculated,” under any circumstances, to “afford” Shoemaker “an opportunity to present [his] objections.” Mullane, 339 U.S. at 314, 70 S.Ct. 652. None of the correspondences or notices of violation mentioned the right to challenge the charges, let alone how such a challenge could be initiated. Nonetheless, the majority seeks to cure this constitutional deficiency by postulating that “[a] simple investigation of the [City Code] or a call to City Hall would have answered Shoemaker’s questions, but he made no such effort.” Maj. Op. at 560. There are a couple of problems with this argument, which will be addressed in turn.
The first and the most obvious problem with the majority’s attempt to excuse the constitutional deficiency of the City’s notice is that Shoemaker did in fact call City Hall. Moreover, he attempted to dispute the factual basis for his violation, and he asked for a ticket so that he could challenge the purported violation in court. But the City neither offered him that opportunity nor informed him of any additional process that was available to him and that he was due.
My second concern with the majority’s position is that because this notice is so disconnected from the opportunity to be heard,- such that the receiving party is left searching for basic answers with respect to his right to challenge the government action, it no longer serves the vital purpose of the notice required by due process. See Mem. Light, Gas & Water Div. v. Craft, 436 U.S. 1, 15, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (“The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending ‘hearing.’ ”).
Shoemaker was neither informed of, nor given any opportunity, to challenge the application of the ordinance to his circumstances. This lack of meaningful notice was constitutionally deficient. See Zilba v. City of Port Clinton, Ohio, 924 F.Supp.2d 867, 884 (N.D.Ohio 2013) (“[T]he only semblance of process Defendant provides is the right to refuse to pay [the ticket]— intentionally committing a minor misdemeanor when the initial offense was not criminal.... Defendant provided ... no indication the ticket could be challenged .... ”). The Enforcement Officer in this case simply repeated his assertion that Shoemaker was responsible for mowing the grass on the disputed property and that the vegetation on that strip of land had grown too tall. Under the Fourteenth Amendment,'this was no notice at all.
B. Insufficient Process
Failing to recognize that notice requires more than simply advising an affected individual that the government plans to deprive that individual of some property interest, the majority proceeds to conduct a deeply flawed analysis of what constitutes sufficient process under the circumstances presented by this case.
*573 The City made only one argument in its briefing as to why it satisfied the strictures of procedural due process. In the City’s own words: “Not only did [Shoemaker] receive actual notice of the violations, but he also received all of the process he was due,” because he had “an opportunity to be heard,” inasmuch as the City’s “Enforcement Officer ... addressed his concerns and explained [the City’s position],” with respect to who should mow the berm, when Shoemaker called City Hall to complain. Appellant’s Br. at 35-36. This so-called “process,” far shy of a formal hearing, was obviously deficient for the simple reason that due process is not satisfied by the use of an adjudicative hearing or review that is conducted by the same government official who was responsible for enforcing the law that led to the deprivation in the first place. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (“[P]rior involvement in some aspect of a case will not necessarily bar ... [an] official from acting as a decision maker. He should not, however, have participated in making the determination under review.”). The phone call between Shoemaker and the Enforcement Officer does not constitute the sort of process required by the Fourteenth Amendment.[4]
Determined to reshape the law of procedural due process, see Yang v. City of Wyoming, Mich., No. 14-1846, 2015 WL 4174760, 793 F.3d 599 (6th Cir. July 13, 2015) (slip op.), the majority side-steps the fatal flaw in the City’s constitutionally deficient argument. Instead of considering the City’s theory of the case, the majority turns to the amici and pretends that the primary argument raised by the amici’s brief was not waived on account of the City’s failure to make that argument itself. The position supported by the amici, however, is not properly before the Court. See Taylor v. KeyCorp, 680 F.3d 609, 615 n. 6 (6th Cir.2012) (“[The amicus] asserts that Taylor has standing to pursue her claims, even in the absence of injury, simply because defendants breached duties owed to her pursuant to ERISA. This argument, however, was not raised by the parties in their appellate briefs. Accordingly, we will not consider this issue.” (citing Cellnet Commc’ns, Inc. v. FCC, 149 F.3d 429, 443 (6th Cir.1998))). The majority’s contention to the contrary — that “the amici simply augmented the City’s position that it did not violate Shoemaker’s procedural due process rights because sufficient procedures were in place” — is patently untrue. See Maj. Op. at 562. Framing the City’s position so broadly that it would encompass any argument in support of finding that the City offered sufficient process, is contrary to binding precedents, defeats the purpose of the waiver rule, and expands the role of amicus curiae beyond recognition. See United States v. Michigan, 940 F.2d 143, 165 (6th Cir.1991) ,(“[A]micus cannot create, extend, or enlarge issue[s].”); see also Barbara J. Fan Arsdale, 4 Am.Jur.2d § 7 (online ed.) (last updated May 2015) (“In general, an amicus curiae must accept the case before the reviewing court as it stands on appeal, with the issues as framed by the parties .... where a party does not adopt an *574 amicus curiae argument in its brief, the •argument is waived on appeal”).
Notwithstanding the impropriety of considering the amici-raised argument, the provisions of the City Code highlighted by the amici provide no more bases to find that the City afforded adequate process to Shoemaker before depriving him of $600. In fact, the need to rely on the amici’s arguments in this case lays bare the fallacy of the majority’s proposition that “Shoemaker could have learned about the procedures for objecting to the allegations against him” by contacting City Hall. Maj. Op. at 560. He did contact City Hall, and the City itself was apparently unaware of any other procedures available to Shoemaker through which he could challenge the violations; the City certainly failed to advise him of any such procedures, and it also failed to apprise the Court of any such procedures in this appeal.
What the amici identify, and the majority relies on, is a maze of City Code provisions that ultimately allow a taxpayer to challenge his or her tax bill. (The majority also discusses the right to challenge a special assessment, which is entirely irrelevant to this case, as the City did not utilize that procedure to deprive Shoemaker of his property.) In any regard, an individual’s right to challenge a tax lien placed against his or her home, or their right to challenge a special assessment, does not in practice (and cannot in theory) be a substitute for the right to initially challenge the purported violation that has ultimately resulted in the deprivation at issue. With respect to this case, the inadequacy of this alleged process (whereby Shoemaker could have challenged his tax bill) could not be any clearer. The bill that augmented Shoemaker’s property taxes was automatically forwarded to the bank that held his mortgage. The bank presumably increased his monthly payment to insure that his escrow account associated with the property taxes had a sufficient balance. Regardless of whether there was any monthly increase, the bank ultimately paid Shoemaker’s property taxes from the escrow account (including the additional $600). Shoemaker was never afforded any opportunity by the City to contest the charges. Shoemaker was unaware of the precise amount of the final bill, but he was ultimately required to ratify the City’s extortion when he tendered to the purchasers of his home the required documentation proving that there were no outstanding taxes on the property. The so-called process offered by the City’s tax dispute system is blatantly insufficient in this context.[5]
Pursuant to Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the sufficiency of process is determined by weighing (1) “the private interest that will be affected,” (2) “the risk of an erroneous deprivation through the procedures used,” (3) “the probable value, if any of additional substitute procedural safeguards,” and (4) “the [government's interest, including the fiscal and administrative burdens” that additional process might entail. The decision to be made in this case was whether the City could force Shoemaker to mow the disputed property, not whether the City issued an accurate bill for his property taxes. Although consideration of the Mathews factors is unnecessary to resolve this case because of the manifest deficiency of the notice offered to *575 Shoemaker and lack of any opportunity be heal’d in actuality, a review of those factors further illustrates both the necessity of affording sufficient process under these circumstances and the relative ease with which the City could have offered that process.
Contrary to the majority’s view, being charged $600 (not to mention having one’s well-maintained garden demolished[6]) is not a “relatively minor” expense for the average American.[7] Nor is the risk of deprivation “minimal” simply because it is objectively ascertainable whether or not vegetation has grown to the height of eight inches. See Zilba, 924 F.Supp.2d at 880-84 (involving a citation for parking in proximity to a fire hydrant, which was objectively defined by statute). Moreover, the risk of a wrongful deprivation is particularly great in a case such as this where the affected individual might never have an opportunity to see the bill, or contest it before payment, because it was forwarded directly to his or her mortgaging bank. And despite the majority’s insistence that additional process would be a financial drain on the City because somehow allowing people to challenge tickets issued to them “would quickly outpace the monies collected as a result of’ issuing the tickets in the first place, there is absolutely no evidence in the record to support that strained and illogical position. Maj. Op. at 562. Cities have not stopped issuing parking tickets (or tickets for a host of other civil infractions) simply because some people actually challenge those tickets. There is absolutely no reason to believe that there would be any meaningful increase in overhead when the infrastructure for challenging tickets based on violations of the municipal ordinances is already in place.
The City’s purported process, which it apparently failed to recognize as a viable option for an individual in Shoemaker’s circumstances, is plainly insufficient to meet the strictures of due process. The notice did not apprise Shoemaker of anything, other than the City’s belief that Shoemaker should cut the grass on the disputed property or risk being charged for failing to do so; and the so-called opportunity to be heard was far too disconnected from the alleged violation to be in any way meaningful, even if Shoemaker had been paying his property taxes directly. See Mem. Light, Gas & Water Div., 436 U.S. at 22, 98 S.Ct. 1554. The judgment of the district court should be affirmed because the City failed to provide sufficient process before depriving Shoemaker of his rightful property.
II. Substantive Due Process
The second issue in this case was also wrongly decided by the majority. Substantive due process guarantees that certain “deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.” Pearson v. City of Grand Blanc, 961 F.2d 1211, 1216 (6th Cir.1992) (internal quotation marks omitted). At its core, this constitutional right protects against government incursions on fundamental rights, government actions affecting an individual that “shock the conscience,” and govern *576 ment actions that are arbitrary and capricious in. nature. Range v. Douglas, 763 F.3d 573, 588 (6th Cir.2014). The City’s actions in this case were arbitrary and capricious because they lacked any rational basis, and therefore, the judgment of the district court should be affirmed on this issue as well.
The majority expends considerable effort attempting to disprove the City’s ownership of the disputed berm and prove Shoemaker’s partial ownership. That effort is seemingly made in vain. This dispute cannot be determined based solely on the formalistic dogma of property law, which suggests that Shoemaker had some undetermined number of sticks in a much larger bundle (which the City treated as de minimis). The determination of this issue, in my view, turns on the reality of Shoemaker’s ownership interest and the beneficial use of the berm in question based on the facts before this panel.
I agree with the majority that under Michigan law Shoemaker had no unique rights with respect to the disputed property, other than the right of reversion (once the City has determined that it no longer has a use for public sidewalks and public streets) and the right of ingress and egress in and out of his own driveway. I disagree, however, with the majority’s paradoxical conclusion that Shoemaker had a “special interest” in the berm and that he had “de facto use of the land.” Maj. Op. at 565-66. That proposition could not be further divorced from reality. Shoemaker may have initially had a special interest in the berm when he purchased his home and treated the berm as an extension of his property by planting a tree on it. But that relationship ended when the City uprooted his tree, made its own improvements and alterations to the property, and told him that the City was the true owner of that ■land. The reality of Shoemaker’s ownership interest is that, after those events, the City had determined that Shoemaker had no real interest in the berm whatsoever.
Although I agree that the ordinance, as generally applied to the berms running along the side of streets throughout the City, does not inevitably run afoul of substantive due process, the City’s actions under these circumstances were violative with respect to Shoemaker because of the way in which the City exploited its presumed ownership interest in the berm. Mainly, the City violated Shoemaker’s due process rights by maintaining, on one hand, that Shoemaker had no right to determine the landscaping of that property, while on the other hand, demanding that Shoemaker was solely responsible for its upkeep. It is not the Court’s prerogative to answer constitutional questions in the abstract. The majority has been led astray by its concern that the ordinance at issue in this case is “ubiquitous from coast to coast.” Maj. Op. at 566. But a decision with respect to Shoemaker does not necessarily implicate the application of every ordinance that requires homeowners to mow the berms that run adjacent to then-property. It is enough to say that on these facts — -where the City excavated Shoemaker’s tree, replaced that tree with a number of saplings (each requiring a tangle of wires to maintain its upwards growth), demanded that Shoemaker maintain the relandscaped property, and then extracted $600 from his mortgage holder pursuant to the City’s property tax lien for his failure to maintain the land over which he apparently had zero control — the City’s actions were arbitrary and capricious, and therefore, in violation of Shoemaker’s substantive due process rights.
There is no rational basis to support the City’s application of the ordinance in the manner that it was enforced against Shoemaker in light of his past dealings with the City respecting this particular strip of *577 land. Contrary to the majority’s naked assertion that Shoemaker “had the de fac-to use of the land,” Maj. Op. at 567, the City repeatedly stated (as well as demonstrated through its actions) that Shoemaker had no control over the berm whatsoever. The City’s justifications for requiring Shoemaker to mow the berm include: protection of property values, traffic control, rodent control, aesthetics, and public health. Although some of these rationales sound reasonable, none of them speak to the issue of why Shoemaker (as opposed to the City) should maintain the berm if he has absolutely no right to control it and choose which trees are to be planted there. The City argues that the berm is a natural extension of Shoemaker’s lawn and that it contributes aesthetic value to his property. However, Shoemaker’s appreciation for aesthetics motivated him to plant a red maple tree with his daughter on that berm. The City removed that tree and replaced it with vegetation of its own choosing. Why Shoemaker . should maintain that newly configured berm with vegetation not of his’ own choosing remains a mystery, for which neither the City nor the majority has provided a satisfactory answer.
CONCLUSION
For the reasons stated above, I would affirm the judgment of the district court on both issues before the panel.
Appendix I
[[Image here]]
*578 Appendix II
[[Image here]]

. The Code Officer had twice sent a more detailed letter explaining the substance of § 622.02 in both May and August 2011, and explained the potential consequences of any failure to comply. But this letter, if it was received, also failed to provide any information about how a violation or the statute itself as applied to Shoemaker could be challenged before the City.

. This time around, the contractor not only trimmed the disputed area, he also entered into Shoemaker's gated and fenced-in backyard to indiscriminately mow the entire prop *571 erty, including mowing over Shoemaker’s well-maintained plants and his strawberry patch.

. Only the first invoice appears on the record.

. The City’s reliance on Silvernail v. County of Kent, 385 F.3d 601 (6th Cir.2004), is misplaced. In that case, the individual was not forced to seek review of a government action with the officer who had determined that enforcement was necessary in the first place. Moreover, the affected individual was provided with a phone number to call for the explicit purpose of challenging “any ... reason why they should not be required to pay the Government Assessment Fee.” 385 F.3d at 605. The apparent purpose of providing the phone number in this case was simply to explain to the affected individual why the City was going to take the action that it was taking.

. The majority also suggests that Shoemaker was afforded sufficient post-deprivation process because eventually any quasi-judicial state action that affects individual rights can be challenged in the Michigan courts, pursuant to the Michigan Constitution. Under the majority’s view, this remedy would all but preclude a court from finding that any administrative action taken by the State, or any of its political subdivisions and the bodies therein, constituted a due process violation.

. See supra n. 2.

. In 2012, the median weekly income for a fully-employed individual in the United States was less than $800. See U.S. Dep’t of Labor, Median Usual Weekly Earning of Full-Time Wage and Salary Workers, Bureau of Labor Statistics, tbl.l, http://www.bls.gov/news. release/wkyeng.tOl.htm (last updated Apr. 21, 2015). Demonstrating just how out of touch the majority is with respect to the economic reality faced by many Americans, the majority implied that $25 and $600 are similar financial stakes, even though $600 is 24-times greater than $25.